In re STONE & WEBSTER, INCORPORATED; 1430 Enclave Parkway Corporation; 245 Summer Street Corporation; AEC International Projects, Inc.; Associated Engineers & Consultants, Inc.; Auburn VPS General Corporation; Auburn VPS Limited Corporation; Belmont Constructors Company, Inc.; Commercial Cold Storage, Inc.; DSS Engineers, Inc.; Enclave Parkway Realty, Inc.; Fast Supply Corporation; Gses Holding, LLC; International Engineers and Constructors, Incorporated; Nordic Holdings, Inc.; Nordic Investors, Inc.; Nordic Rail Services, Inc.; Nordic Refrigerated Services, Inc.; Nordic Refrigerated Services, Limited Partnership; Nordic Transportation Services, Inc.; Polar Transport, Inc.; Power Technologies, Inc.; Prescient Technologies, Inc.; Projects Engineers, Incorporated; Rockton Associates, Incorporated; Rockton Technical Services Corporation; Sabal Corporation; Sabal Real Estate Corporation; Saw Consulting Services, Inc.; SC Wood, LLC; Selective Technologies Corporation; Sleeper Street Realty Corporation; Stone & Webster ABU Dhabi (United Arab Emirates), Inc.; Stone & Webster Asia Corporation; Stone & Webster Auburn Corporation; Stone

& Webster Bharat, Incorporated; Stone & Webster Binghamton Corporation; Stone & Webster Civil and Transportation Services, Inc., Stone & Webster Construction Company, Inc.; Stone & Webster Development Corporation; Stone & Webster Dominican Republic, Incorporated; Stone & Webster Engineers and Constructors, Inc.; Stone & Webster Far East Technical Services Corp.; Stone & Webster Indonesia Corporation; Stone & Webster Industrial Technology Corporation; Stone & Webster Inter–American Corporation; Stone & Webster International Corporation; Stone & Webster International Projects Corporation; Stone & Webster Italia, Incorporated; Stone & Webster Korea Corporation; Stone & Webster Kuwait, Incorporated; Stone & Webster Overseas Development Corporation F/K/A Stone & Webster Lithuania Corporation; Stone & Webster Management Consultants, Inc.; Stone & Webster Middle East Engineering Services Corporation; Stone & Webster of Argentina Corporation; Stone & Webster of Mexico Engineering Corporation; Stone & Webster Oil Company, Inc.; Stone & Webster Operating Corporation; Stone & Webster Overseas Consultants, Inc.; Stone & Webster Overseas Group, Inc.; Stone & Webster Pacific Corporation; Stone & Webster Power Engineering Corporation; Stone & Webster Power Projects Corporation; Stone & Webster Procurement Corporation; Stone & Webster Puerto Rico, Incorporated; Stone & Webster Saudi Arabia, Incorporated; Stone & Webster Taiwan Corporation; Stone & Webster Technology Corporation; Stone & Webster Wallingford Corporation; Stone & Webster Worldwide Engineering Corporation; SWL Corporation; Stone & Webster Engineering Corporation; and Stone & Webster Michigan, Inc., Debtors.

Nos. 00–2142 to 00–2214.

United States Bankruptcy Court, D. Delaware.

May 30, 2002.

Gregg M. Galardi, Esquire and Gary A. Rubin, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Edward J. Meehan, Esquire and David E. Carney, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC; counsel for Debtors.

Michael B. Joseph, Esquire, and Theodore J. Tacconelli, Esquire, Ferry & Joseph, PA, Wilmington, Delaware; William J. Kayatta, Jr., Esquire, Deborah L. Shaw, Esquire, and Jared des Rosiers, Esquire, Pierce Atwood, Portland, Maine; counsel for Maine Yankee Atomic Power Company.

## MEMORANDUM OPINION

MCKELVIE, District Judge.

This is a commercial dispute that arises in the context of a bankruptcy action.

Stone & Webster Engineering Corporation ("SWEC") is a Massachusetts corporation with its principal place of business in Boston, Massachusetts. Stone & Webster Incorporated ("SWINC") is a Delaware corporation with its principal place of business in Boston, Massachusetts. Stone & Webster Engineers and Constructors, Inc. ("SWE&C") is a Maryland Corporation with its principal place of business in Boston, Massachusetts. The Stone & Webster companies are affiliated in the following manner. SWINC owns one hundred percent of the shares of SWE & C which, in turn, owns one hundred percent of the shares of SWEC. The court will refer to these three companies collectively as either "the Debtors" or "the Stone & Webster companies."

Claimant Maine Yankee Atomic Power Company is a Maine corporation with its principal place of business in Wiscasset, Maine. Maine Yankee owns a nuclear power generating facility in Wiscasset, Maine.

This dispute arises from a contract, effective August 31, 1998, that was entered between Maine Yankee and SWEC, whereby Maine Yankee hired SWEC to decommission Maine Yankee's Wiscasset nuclear power generating facility (the "Decommissioning Agreement"). Pursuant to the Decommissioning Agreement, SWE&C and SWINC executed written guaranties of SWEC's performance under the Agreement. SWE&C executed its written guarantee of SWEC's performance at the time that Maine Yankee and SWEC entered into the Agreement, while SWINC executed its written guaranty in December of 2000, in the wake of concerns voiced by Maine Yankee regarding SWEC's solvency.

On May 4, 2000, Maine Yankee issued a notice to SWEC stating that it was terminating the Decommissioning Agreement based upon SWEC's insolvency and because SWEC had not adequately performed under the contract. Both purported grounds for termination are provided for under the contract as allowable reasons to terminate the Agreement for cause. Soon thereafter, on June 2, 2000, SWINC, and certain of its affiliates, including SWE&C and SWEC, filed voluntary petitions for bankruptcy relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1330. Maine Yankee has assumed the role of the contractor on its project, and is currently proceeding with the decommissioning of the power plant.

On August 23, 2000, Maine Yankee filed proofs of claim in the bankruptcy cases against SWEC and against SWINC and

SWE & C, as guarantors of SWEC's performance. Maine Yankee's proofs of claim seek damages from the debtors for SWEC's breach of the Decommissioning Agreement. On November 16, 2000, the Debtors objected to Maine ˙ Yankee's claims, arguing that the court should disallow the claims because Maine Yankee did not properly terminate the Decommissioning Agreement for either insolvency or failure to perform and, in any event, did not have a right to damages for terminating the agreement on account of SWEC's insolvency.

On February 13, 2001, the court held a one-day non-jury trial to consider Maine Yankee's claims and certain of the Debtors' threshold defenses. In an opinion dated July 26, 2001, the court ·refused to disallow Maine Yankee's claims.[1] However, it did permit SWEC to assert its own claims against Maine Yankee for work performed by SWEC that was uncompensated by Maine Yankee. Any damages proven by SWEC could then be set-off against Maine Yankee's claims.

In a subsequent memorandum opinion, dated November 21, 2001, the court considered several motions for partial summary judgment that had been filed by the Debtors. The court granted the Debtors' motion limiting Maine Yankee's damages claim to the $65 million damages cap set forth in Article 30.2 of the Decommissioning Agreement. The court denied the remainder of Debtors' motions, which sought summary judgment based on the following affirmative defenses: (i) that Maine Yankee's damages claim is unripe due to Maine Yankee's failure to fulfill certain conditions precedent under the Decommis-

sioning Agreement; and (ii) that Maine Yankee's claim should be barred because it failed to mitigate damages by refusing to accept the tender of performance offered by SWINC and SWE&C.

In order to resolve Maine Yankee's August 23, 2000 Proofs of Claim, the court held a seven day bench trial between November 26 and December 3, 2001. The principal issues presented to the court included: (i) whether Debtors are liable to Maine Yankee for breach of the Decommissioning Agreement; (ii) what amount of damages, if any, is Maine Yankee entitled to from SWEC for SWEC's alleged breach of the Decommissioning Agreement; and (iii) what amount of damages, if any, is Maine Yankee entitled to from SWINC and SWE&C pursuant to their guarantees of SWEC's performance under the Decommissioning Agreement. If it finds that Maine Yankee is entitled to damages, the court must also resolve whether its findings based on the trial are to be used for purposes of allowing Maine Yankee's claim or for purposes of estimating the dollar amount of Maine Yankee's future allowable claim.

Closing arguments in the trial were made on April 3, 2002, and the post-trial briefing is now complete. Having reviewed the trial transcript, exhibits, and briefing, this is the court's decision on Maine Yankee's Proofs of Claim.

## I. FACTUAL BACKGROUND

The court draws the following facts from the stipulated facts set forth in the pretrial order and from the testimony and exhibits presented during the trial in this case.

---

1. The court found that Maine Yankee properly terminated the Decommissioning under Article 11.1, for insolvency, and has the right to recovery for damages under Article 11.4 of the Agreement. The court also found that

Maine Yankee properly provided notice and time to cure prior to termination. The court did not rule on the propriety of Maine Yankee's termination for failure to perform under Article 11.2 of the Agreement.

In its case in chief, Maine Yankee called eleven witnesses, including Wayne Norton, Maine Yankee's current President and its former contract manager and Vice President of Decommissioning; Edward Doubleday, Maine Yankee's damages expert; Raymond Burke, Maine Yankee's current Vice President of Decommissioning and the former contracts manager for SWEC on the Maine Yankee decommissioning project; Michael Evringham, Maine Yankee's current contracts and procurement manager; Todd Smith, Maine Yankee's project controls manager; David Holbert, Maine Yankee's logistics project manager for the waste management group; Michael Meisner, Maine Yankee's former President and current Chief Nuclear Officer; Paul Plante, Maine Yankee's project manager for cask loading and fuel transfer; James Garvey, Maine Yankee's director of business integration; Michael Thomas, Maine Yankee's Vice President and Chief Financial Officer; and Robert Gerber, an environmental consultant who assisted Maine Yankee and SWEC on the decommissioning project.

Maine Yankee also designated portions of deposition testimony from James Bernhard, the Chief Executive Officer of the Shaw Group, a company that bid on the Maine Yankee project and ultimately acquired the assets of Stone & Webster at a bankruptcy auction, and Jerome Kane, the replacement project manager that SWEC deployed to manage the decommissioning project.

The Debtors called five witnesses in its case in chief, including: Jerome Kane; Weslie Boyea, SWEC's project controls manager who was assigned to the decommissioning project; Thomas Nauman, a current Shaw employee who used to work for SWEC and drafted the SWEC proposal used to obtain the winning bid for the decommissioning project; Dennis Staats, the Debtors' damages expert; and James Carroll, the President and Chief Restructuring Officer of SWINC.

The court will summarize the pertinent facts and testimony.[2]

### A. SWEC's Bid and the Decommissioning Agreement

#### 1. SWEC's Bid

In 1997, Maine Yankee's nuclear power plant in Wiscasset, Maine ceased operation. At that time, Maine Yankee considered a variety of options for decommissioning the plant. It decided to pursue an approach whereby the plant would be decontaminated and dismantled.

Wayne Norton testified as to why Maine Yankee sought out a contractor to perform the decommissioning task. He explained such an approach would "transfer as much risk to the contractor as possible to help ensure cost control and schedule compliance and the like for completion of that project." Norton also explained that Maine Yankee determined that it could get a good deal on the decommissioning work. He noted that at the time, the nascent market for decommissioning of nuclear power plants appeared to be growing, making it more likely that a good price could be obtained for the work from contractors seeking to position themselves to be market leaders in the decommissioning industry by successfully completing the Maine Yankee project.

In order to solicit and gather bids from contractors, Maine Yankee developed and issued a Request for Proposals ("RFP")

---

**2.** The court will exclude from its recitation of the facts in this section the testimony of the parties' experts on damages. Instead, the court will recount that testimony in the discussion section relating to damages.

that set forth various terms and conditions required of bidders. Under the RFP, the contractor that was selected would be responsible for restoring the Maine Yankee site to "green field" condition and completing the "decommissioning," as defined by the Agreement. This would involve, essentially, making the facility safe and ensuring that radioactive or contaminated materials are either removed or shielded so that they pose no risk to either humans or the surrounding environment. Pursuant to the RFP, the contractor would have the ability to decide on the means and methods to carry out their responsibility, subject to the approval of Maine Yankee.

Maine Yankee analyzed the technical, commercial, and financial abilities of the bidders in order to "verify their abilities, adequacy, and capacity" to perform the decommissioning work. The qualified bidders than proceeded to negotiate certain terms and conditions of the RFP based on the bidders' proposals to do the work. Maine Yankee and the bidders also exchanged a series of questions and answers about the RFP and the bidders proposals. These questions and answers, along with any negotiated changes made to the RFP, were amended into a document called the Amended RFP which was incorporated into the final Decommissioning Agreement.

Maine Yankee ultimately accepted SWEC's bid, which proposed to decommission the Maine Yankee power plant for a fixed cost of $252 million.[3] The SWEC bid was unique in that they proposed a unique way of disposing the above ground concrete from the site, by rubblizing the concrete on site and then burying it within the foundation of the plant on site. At that time, Maine Yankee reviewed the rubbliza-

tion concept and stated that it seemed to be a "technically sound" way to dispose of the above ground concrete. Later, this process was disallowed by the State of Maine regulatory authorities, when the State determined it would deem the rubblized concrete "special waste," and subject its disposal to Maine regulations. This determination has necessitated the costlier off-site disposal of this concrete and has been a point of contention between the parties.

In order to decommission a nuclear power plant, there are certain radiological clean-up standards that must be followed. One such standard promulgated by the Nuclear Regulatory Commission ("NRC") is called a derived concentration guideline limit or "DCGL." SWEC's bid proposed that it would seek to clean to a DCGL of 20,000 disintegrations per minute ("DPM"), a level that was lower than that required by environmental regulations. SWEC clarified in its answers to questions, however, that it intended to use the 20,000 DCGL as a guideline to meet the NRC standard of 25 millirem ALARA, rather than as an independent limit.[4]

### 2. *The Decommissioning Agreement*

Effective August 31, 1998, Maine Yankee and SWEC entered into the Agreement Between Maine Yankee Atomic Power Company and Stone & Webster Engineering Corporation For the Decommissioning of the Maine Yankee Power Plant. Pursuant to the Decommissioning Agreement, SWEC agreed to perform certain work and render services, which included the decommissioning of a nuclear power generating facility owned by Maine

---

3. The original fixed price contract that SWEC was awarded was $250.6 million. The parties subsequently amended that contract to revise the total fixed price to $252 million.

4. The court will further discuss details of these standards, infra, in section I.D.2, when detailing the regulatory issues that have led to disputes between the parties.

Yankee and located in Wiscasset, Maine, and the construction of a fuel storage installation to store spent nuclear fuel from the power facility (the "ISFSI"). The broad commitment that SWEC made was that it would "perform the Work, including Decommissioning of the Maine Yankee Site, necessary to achieve Green Field, all as further described in the Amended RFP and the Contractor's Proposal," which were attached and incorporated into the Decommissioning Agreement.

Under the Decommissioning Agreement, SWEC was responsible for completing the project and managing and paying the subcontractors. SWEC was also responsible for the procurement of all necessary licensing and permitting from "regulatory agencies and government bodies having jurisdiction over the Work." In addition, SWEC was responsible for the development of a project management plan and schedule necessary to complete the project on-time and on-budget. The requirements for the development of the schedule are set forth in Section 11.9 of the Amended RFP, which is attached and incorporated into the Decommissioning Agreement as Schedule C.

As explained by Raymond Burke and James Garvey, section 11.9 requires SWEC to provide the schedule using a scheduling software package called P–3. It must also update the schedule to show progress thereunder. The schedule must delineate the project's execution, logical constraints on project tasks, durations for tasks, project ·milestones, and beginning and completion dates for each task. It must also include dates for licensing activities, interfaces with subcontractors, arrival of personnel, etc. The completion date for physical work was to be April 2004, and the completion date for license termination was to be September 2004.

Pursuant to section 11.9.3.3, the schedule was to be submitted to Maine Yankee within 90 days of the contract's execution and was subject to Maine Yankee's approval. SWEC was also to report progress and project status to Maine Yankee, which used the schedule as a project management device. If SWEC deviated from the critical path logic of the schedule or missed a project milestone by more than 20 days, the Agreement requires SWEC to set forth a revised schedule indicating new logic and a plan for recovering the lost time. Moreover, if SWEC is projected to exceed the completion date by more than 6 months, Maine Yankee could take over the project and take reasonable measures to attempt to implement the schedule at SWEC's expense.

According to the Agreement, Maine Yankee was to compensate SWEC using an earned value concept, under which major elements of work for the project were assigned values, and SWEC was paid those values as it completed those elements. Pursuant to Articles 4.2 and 4.4 of the Agreement, Maine Yankee paid SWEC part of the contract price every month, based on monthly invoices that SWEC submitted for itself and the subcontractors, based on earned value and for reimbursable charges incurred, as those terms are defined in the Agreement. Article 30.1 obligates SWEC to waive any rights to a mechanic's lien upon payment of services and requires it to obtain written waivers of such liens from the subcontractors. Thus, prior to receiving payments from Maine Yankee, SWEC had to sign lien waivers attesting that it had paid all of the subcontractors working on the project.[5]

---

**5.** The signed lien waivers would state: "Contractor herein represents that all bills of Contractor's Subcontractors who performed Work or furnished materials for the perfor-

Another contractual requirement, set forth in Article 24A.2, obligated SWEC to procure performance and payment bonds, each in the amount of 15% of the contract price. SWEC obtained the requisite bonds from Federal Insurance Company, each in the amount of approximately $38 million.

Article 11 of the Agreement, entitled "Termination for Cause," governs Maine Yankee's right to terminate the Agreement for cause. Article 11.1 provides, in pertinent, part:

11.1 Maine Yankee shall have the right, upon written notice to Contractor, to terminate the Agreement without any further liability to Contractor over and above compensation for Work performed, in the event of the occurrence of any of the following:

11.1.1 insolvency of the Contractor;

The first paragraph of the Agreement expressly defines SWEC as "the Contractor."

Section 11.2 further provides that Maine Yankee may terminate for cause in the event that SWEC· fails to substantially perform or breaches the Agreement. It states that "if [SWEC] fails to substantially perform under the Contract Documents or if [SWEC] materially breaches any of the terms of the Contract Documents ... Maine Yankee shall have the right, without further liability to [SWEC], upon giving contractor written notice and reasonable time to remedy such deficiency, to:" (i) terminate the Agreement, "upon giving an second written notice to [SWEC] of such termination and the basis thereof, if [SWEC] has failed to initiate the remedy in a reasonable fashion" within 30 days of the initial notice; (ii) obtain performance of "the [SWEC's] obligations from another contractor and recover reasonable excess cost resulting therefrom;" and/or (iii) sue SWEC to enforce the remedies provided "for [SWEC's] failure to perform as set forth in the Contract Documents."

Sections 11.3 and 11.4 further provide that:

11.3 A termination under this article shall be effective immediately upon receipt of any written notice as described in Article 11.1 or Article 11.2.1 by the Contractor. The Contractor shall immediately cease Work, commence demobilization of any affected forces and promptly remove from the Site materials and equipment belonging to Contractor which have not been fully paid for by Maine Yankee. If requested to do so by Maine Yankee, Contractor shall promptly transfer title and deliver to Maine Yankee such completed or partially completed and paid for Work and assign any Subcontracts rights as Contractor may have with any third parties for the Work. Contractor shall attempt to promptly settle any liabilities and claims arising out of any resulting termination of subcontracts and orders at no cost to Maine Yankee.

11.4 If the unpaid Agreement funds, including any funds payable to Maine Yankee by reason of letter of credit, performance bond or insurance coverage, fail to compensate Maine Yankee for the total direct damages and costs incurred by Maine Yankee to finish the Work, Contractor shall pay such difference to Maine Yankee within thirty (30) days following receipt of an undisputed

mance of said Subcontracts have been paid for their Work pursuant to the terms of said Subcontracts and covered by the above payment, and Contractor further agrees to indemnify and hold harmless Purchaser and

Owner from any and all manner of actions, cause of action, suits, in law or in equity, which any such Subcontractor or supplier may bring ...."

invoice from Maine Yankee. This obligation for payment shall survive the termination of the Agreement or relevant portion thereof.

Article 30.2 of the Agreement, however, limits Maine Yankee's recovery for "any and all claims arising out of or in connection with its services" under the Agreement to $65 million, including credits to SWEC for amounts payable under the bonds that Federal Insurance Company had issued.[6]

### B. The Parent Companies' Guaranties of SWEC's Performance

The Decommissioning Agreement also required that SWEC obtain financial security for its performance in the form of bonds and a parent guaranty. As noted above, pursuant to Article 24A.2 of the Decommissioning Agreement, and Addendum No. 3 thereof, SWEC's performance was guaranteed by SWINC and SWE&C.

Under the terms of each guarantee, SWINC and SWE & C each agreed to "guarantee [SWEC's] performance of the Agreement up to an amount equivalent to fifty percent (50%) of the Agreement's unpaid balance of the contract price (as such term is defined in the Agreement) at the time of [SWEC's] failure to perform the Agreement."

### C. SWEC's Performance under the Decommissioning Agreement

According to Norton, problems with SWEC's performance on the decommissioning project began to occur as early as 1999. The problems can be grouped into the following categories: (i) financial issues at SWEC, whereby SWEC was unable to pay its bills or its subcontractors; (ii) SWEC's failure to develop an adequate project schedule; and (iii) SWEC's failure to make adequate progress on the project.

It was at that time, due to concerns about SWEC's solvency, that Maine Yankee sought and received the parent guarantee memorialized in Addendum No. 3 as described above.

Raymond Burke, for Maine Yankee, testified about the problems SWEC was having on the decommissioning project. Presently, Burke is the Vice President of Decommissioning at Maine Yankee and is responsible for leading the physical demolition of the Maine Yankee site and rendering it clean. He was previously employed by SWEC and served as the contracts manager on the Maine Yankee project, starting in July of 1999.

Burke reported that at the time he came onto the Maine Yankee project, Chuck Lepisto was the project manager for SWEC. Burke's assessment of the performance of the SWEC management team was that it was "having its problems in coordinating and executing the work" and was having problems, particularly, in the area of licensing and permitting. Specifically, he testified that "the licensing/permitting side of the project seemed to make gross miscalculations as to what the [regulatory] requirements were from a Maine [state law] standpoint." He also noted that SWEC did not have anyone on the job site that was knowledgeable and experienced in Maine environmental regulation, that SWEC had a strained relationship with the State of Maine on environmental issues, and that at the time SWEC had entered the contract it was focusing only on federal regulations, such as those by the NRC. These miscalculations resulted in work stoppages due to delays in getting

---

6. As per the court's November 21, 2001 opinion, the damages cap applies both to Maine Yankee's own claims and to equitable subrogation claims held by Maine Yankee that originally belonged to the subcontractors.

appropriate licensing or the unintentional performance of certain physical work prior to obtaining requisite permits for that work.

Burke also testified that in November 1999, Lepisto signed a lien waiver that inaccurately represented that certain subcontractors had been paid when SWEC had not paid them. After that event, SWEC agreed that only its financial executives would sign lien waivers. Last, Burke testified that as of April 2000, SWEC was behind $50,000 in its payments to subcontractors and did not have enough money to pay those subcontractors. By the date of termination, May 4, 2000, SWEC was $1.7 million behind in its payments to subcontractors.

Burke next testified about problems with the schedule. Under the Decommissioning Agreement, SWEC was required to generate and maintain a project schedule, to serve as a basis for project tracking and the earned value payments. Burke reports that as of December 1999, there was still not an approved schedule. The schedules that SWEC had submitted were not resource loaded to include the costs of labor, supplies, etc. Moreover, the schedules were incomplete. To remedy this, SWEC and Maine Yankee employees met in workshops. Burke explained that the workshops were designed to provide SWEC with a better understanding of the complexity and details of the project. After the workshops, Burke states, the number of tasks in the schedule nearly doubled and the completion date of the project was pushed from April, 2004 to sometime in 2005.

Last, Burke testified about the impact of SWEC's financial difficulties on its ability to manage the project. He stated that the financial difficulties that came to light in April and May of 2000, adversely impacted employee morale, caused a number of employees to resign, and led to tense relations with SWEC's subcontracts and suppliers.

Jerry Kane was called by the Debtors to testify about the problems at the Maine Yankee project and his attempts to solve those problems. Kane was SWE&C's Vice President and Director of Nuclear Operations and was also the second SWEC project manager for the Maine Yankee project. He replaced the first manager, Chuck Lepisto, at the request of Maine Yankee, which had expressed dismay with Lepisto's "lack of leadership and inability to manage the project."

Kane's testimony confirms that under Lepisto's leadership, the project was having numerous problems. He noted that Lepisto had "never run a large fixed price contract [involving liquidated damages on a schedule and] was way over his head." Kane explained that the Maine Yankee project was not merely a construction project; it involved licensing, engineering, health, physics, and radioactive waste clean-up. While Lepisto was a "good construction site manager," he had never been involved with a project of this complexity and scale. Kane also explained that the Maine Yankee proposal bid had been prepared by Lepisto and "sold" to the Stone & Webster management "on the premise that it was purely a deconstruction—a construction job in reverse, and that there was very little technical content."

On or about December 6, 1999, Jim Callahan, the Senior Vice President of the Boston Office of SWINC, received a call from Maine Yankee's Michael Meisner, who asked Callahan to remove Lepisto. Callahan called upon Kane, who was "the most senior person and most experienced person in running large projects" that SWEC had, to immediately take over the project manager position of the Maine Yankee project. Kane went on to testify

that when he arrived, he found that SWEC was significantly over-budget in man hours spent with regard to the schedule, that the organization of the project was "dysfunctional," that it had overspent the entire project contingency, and that it had failed to take into account SWEC's obligations to comply with Maine regulations. Kane further explained that when he arrived on site, he found that the project was "dysfunctionally organized" in that "it was organized by a construction person who felt that all of the other aspects of the project, including cost and scheduling, engineering, contracts, health, physics, RAD waste, licensing, were secondary to the construction effort." The project was being run only by Lepisto and one manager of construction, without giving proper consideration to management of the numerous technical functions of the project. As a result,

> the project was being run in a haphazard manner in that schedules were made at the morning meeting. One of the construction superintendents would say I didn't get that job done yesterday and then say alright, the job that was scheduled today we won't do, we'll finish the one yesterday, or even worse, the job that was supposed to start today, somebody would say I didn't have the materials or I'm not ready to start the job or didn't have the work permit or whatever and he, the construction manager, literally would reach out two, three, four weeks ahead in the schedule, pick a task and say alright, we'll do this one today, and we weren't ready, we didn't have work packages, we didn't have permits, we didn't have sketches, we didn't have a plan.

Kane also reported that due to these problems, the relationship with Maine Yankee was "horrible at best."

Kane testified that upon his arrival, he made a number of changes that resulted in a dramatic improvement in the project. He moved Lepisto off of the project, he placed technically knowledgeable SWEC employees in meetings with Maine Yankee, he realigned the structure of the project by assigning managers for the construction, engineering, and licensing functions, he cut costs, and he set up performance metrics to track performance. Starting in January 2000, Kane also sought to complete a fully integrated detailed schedule and obtain Maine Yankee's approval thereof.

Kane stated that he could not get the schedule approved because each of Maine Yankee's project managers had different approaches and wanted the work done in different ways. Kane explains that the workshops between Maine Yankee and SWEC personnel were set up in order to try to get consensus on a uniform approach to planning the work and associated scheduling items. Although SWEC did not ever gain Maine Yankee's approval, Kane noted that there was a substantial improvement in scheduling areas, with the exception of the licensing area, and the workshops helped SWEC to put together the schedule that they were working when Maine Yankee terminated the Agreement.

Kane stated that his changes were yielding improvements and SWEC was beginning to meet its schedules and cost estimates and to get the project "under control." For example, SWEC's percentage of actual versus planned start dates for tasks rose from a "dreadful" 30 percent (70 percent not on schedule) to around 60 percent. He also said that the scheduling was proceeding well, with the exception of licensing matters, which were "under the control of Maine Yankee." Kane also reports that in January and February, he began to get positive feedback from Maine

Yankee's Meisner, Norton, Evringham, and Garvey on the improvements to the project. Kane states that soon thereafter, when SWEC completed the task of removing the steam generators ahead of schedule, Maine Yankee threw them a party to celebrate this success. To reward his workers, based on an earlier promise to give them time off if they beat the schedule, Kane gave the craft laborers and subcontractors a week off with pay. Kane reported that while his bosses at SWEC were displeased, this action was well received by Maine Yankee.

In Kane's opinion, given the improvements in performance on the project, Maine Yankee's termination on May 4, 2000—to the extent it was based on performance issues rather than insolvency was not justified. It was a "180 degree" change from Maine Yankee's position. Kane observed that although SWEC "was a long way from perfect, [ ] we were improving steadily and we were performing good work." Kane did express, however, that if it were up to him, he would never have entered into the Decommissioning Agreement because it was a high risk lump sum contract that "onerous to the maximum," "required [SWEC] to do things that we couldn't do in a time we couldn't do them," and "gave [Maine Yankee] approval of every move that we made. . . ."

James Garvey, for Maine Yankee, also testified about schedule issues. Garvey, who drafted the scheduling provisions (section 11.9) of the RFP, which concerns scheduling, reviewed those sections in his testimony, stressing the importance of having an accurate project schedule and noting that an accurate and comprehensive project schedule allows for proper management and projections of cash flow and staffing. He explained that SWEC did not submit a project schedule until February of 2000 and that the schedule it submitted did not comply with the Agreement. It had open ends, inconsistent logic, and failed to identify all of the scope of work. Moreover, he said, the updated versions of the schedule were inaccurate because they continued to show that the project was on track for on time completion, due to an inappropriate "mandatory constraint" that fixed that date in the schedule, instead of letting it logically float based on the completion of all the necessary tasks. Thus, according to Garvey, despite the fact that the schedule had tasks shown as being incomplete until December 2004, the end date still showed up as September 2004.

After Maine Yankee terminated the Agreement, it took over the schedule. In order to use it going forward, Garvey reports that it had to modify the schedule to add an immense amount of detail that SWEC had not included. Moreover, Garvey states that his assessment of SWEC's performance, based on its earned value, shows that SWEC only earned 75–85% of its projected earned value in 1999 and 80% in 2000, which demonstrates that SWEC was behind schedule.

Weslie Boyea testified for the Debtors about schedule issues. Boyea states that he and Garvey discussed project schedule matters and the earned value system for a period of time. Based on those discussions, Boyea designed a schedule and submitted it to Maine Yankee within 90 days. No one complained it was late. Maine Yankee, however, rejected it. He testified that every schedule that SWEC ever submitted was rejected by Maine Yankee, because the different departments of Maine Yankee always had additional "comments" and criticisms.

Boyea recounted one particular instance, in April 1999, in which Maine Yankee gave SWEC conditional approval of the project schedule, contingent on SWEC accepting certain conditions and responding to a

number of questions about the schedule. Boyea stated that although SWEC complied with these contingencies, Maine Yankee did not approve the schedule. Instead, Maine Yankee proceeded to engage SWEC in new rounds of questions, submissions, and responses for the majority of the summer. By July 1999, it was Boyea's understanding that only two deviations were left to be addressed before the schedule was given final approval. Both related to licensing issues, with one relating to the ISFSI.

Boyea states that on the evening of September 1, 1999, Wayne Norton and another Maine Yankee employee came to his office. Norton told Boyea that if he submitted a completed schedule to him that night, Norton would get it approved the following day. Boyea reports that he stayed until 9:00 PM that evening to put the transmittal document together and hand delivered it to Norton's office that night. Boyea stated, however, that Maine Yankee did not approve that schedule either, due to other "commercial issues" that Maine Yankee subsequently raised with SWEC. Despite the resolution of these issues, Boyea states that Maine Yankee was still expressing concerns with various portions of the schedule. Boyea did acknowledge, however, that Maine Yankee and particularly its contracts manager, Norton, had the right to insist that SWEC keep a schedule for the job with proper logic to manage the project and that SWEC meet the milestones set forth in the Agreement. He also stated that the questions and information sought by Maine Yankee were appropriate in developing a detailed project schedule.

Soon thereafter, Maine Yankee and SWEC decided to adopt the project workshop approach, to facilitate the approval of the schedule. Boyea explained that the project workshop approach was to break the schedule down into various large projects (e.g., major component removal, reactor pressure vessel internal segmentation, licensing, ISFSI, demolition, etc.). Each large project was reviewed in detail by Maine Yankee and SWEC personnel to "go through all the detail and make sure everyone was clear on how the restraints worked, any other detail we needed in there, etcetera." Boyea reported that the workshops continued through January, February, and March, and were fairly successful. He stated that, as of the date of termination, the final schedule had not been approved because the ISFSI schedule could not be finalized, due to complications in permitting of that portion of the project arising from a lawsuit between Maine Yankee and the regulatory authorities.[7]

Boyea stated that under the April monthly progress report, the last schedule SWEC made before termination, the Maine Yankee project was running 66 working days late. He also explained that the faulty mandatory constraint that Garvey testified about, was either an oversight due to the frequent passing back and forth of the schedule between Maine Yankee and SWEC or resulted from corruption in the schedule file caused by his order to turn off the computers on the termination date at a time when multiple SWEC employees were likely working on the schedule. Boyea also testified that the schedule enclosed in Kane's June 20, 2000 letter to Evringham shows that the project was projected to be completed on time. He explained that although it "would have been a very aggressive schedule and would have required very good performance on [the part

---

7. Boyea stated that this lawsuit is against the State of Maine, but based on other facts in evidence, the court believes that the suit to which he is referring is against the DOE.

of] all parties," it was an achievable schedule.

### D. *Regulatory Issues Affecting the Maine Yankee Project*

Throughout SWEC's performance under the Decommissioning Agreement and the Interim Services Agreement and Maine Yankee's self-performance of the decommissioning of the Maine Yankee plant, numerous regulatory issues confronted the parties and required changes to the clean-up standards used on the decommissioning project. The parties disputed and continue to dispute whether these changes were within the scope of the work that SWEC agreed to do—and thus are compensable to Maine Yankee—or whether those changes constituted changes to the scope of the work that SWEC agreed to do—and thus are not properly compensable to Maine Yankee. Because the question of which party is to bear the burden for these regulatory issues is central to the parties' damages dispute, the court will attempt to summarize the factual context for those issues in this section.

Michael Meisner, Maine Yankee's Chief Nuclear Officer and former President, explained during his testimony that the decommissioning of nuclear plants is heavily regulated by both state and federal regulatory bodies, including the NRC, the Environmental Protection Agency ("EPA"), and the Maine Department of Environmental Protection ("MDEP"). These bodies set forth various standards that regulate the allowable levels of contaminants on the site. As noted earlier, under the Decommissioning Agreement, SWEC was to comply with all applicable regulations and was responsible for securing all necessary licenses and permits to do the work. SWEC was to identify the needs for permits or licenses, prepare the applications, provide it to Maine Yankee for review, and then submit it to the applicable agency to gain approval. Due to the lack of expertise in the SWEC project team in the area of regulations—particularly, Maine regulations and the MDEP—SWEC asked Meisner to work with them to help secure the necessary licenses from the agencies. The licensing and permitting process necessarily involves participating in public proceedings, in which regulators and other stakeholder groups question the type of work being done.

#### 1. *Rubblization and the "Special Waste" Issue*

As noted above, part of what SWEC proposed in its decommissioning plan was to rubblize (i.e., grind up and compress) the above ground concrete structures and dispose of that rubble on site by burying it in the below ground foundations of the buildings. Kane testified that one of the reasons SWEC won the project was that the rubblization approach allowed them to save money and thus submit a lower winning bid. At that time, Maine Yankee was a strong advocate of that approach and believed it to be technically sound from a public health and safety point of view. The rubblization approach had been used before, and approved by the NRC, but never involved the volume of concrete—1.4 million cubic feet—that would be involved at the Maine Yankee facility. Moreover, as Maine Yankee's facility was the only nuclear power plant in Maine, rubblization had never been done in association with a decommissioning in the State of Maine. Nonetheless, in 1998 at the time of the proposal, there was no indication from any regulatory body that the approach would be problematic. To the contrary, both Maine Yankee and SWEC thought that rubblization would be a viable and cost-effective plan.

In connection with the licensing process, Maine Yankee began releasing draft portions of the decommissioning plan to the public and to regulatory bodies such as the MDEP. By the end of the summer of 1999, it became clear that, while the NRC had no problem with the rubblization approach, the State of Maine was concerned about it and were considering deeming the rubble "special waste" under Maine solid waste law. The determination of whether a waste item constitutes "special waste" is within the discretion of MDEP. Robert Gerber, an environmental consultant who worked with Maine Yankee and SWEC on the decommissioning, explained that the statutes and regulations are configured to give MDEP a "wide band of discretion in labeling something as special waste." Once the State labels a waste item to be "special waste," a host of Maine regulations come into play that deal with how that special waste is to be disposed of. Ultimately, towards the end of 2000, MDEP declared that if Maine Yankee proceeded to bury the rubblized concrete on site, it would be declared special waste. By designating materials "special waste," instead of inert fill, Maine was able to regulate radioactive materials. Meisner reported that Maine Yankee realized that if they buried the concrete on-site, the State would impose additional and perhaps very costly requirements on how the concrete was to be left.

Maine Yankee hired Gerber to try to convince MDEP not to label the concrete rubble as "special waste." Despite his efforts, Maine Yankee was unable to convince the State of Maine to alter course. On February 23, 2000, the MDEP designated the concrete rubble as special waste. The MDEP did so—irrespective of the low radioactivity levels of the rubblized concrete due to the significant volume of concrete to be buried and its chemical characteristics, which included the presence of contaminants such as PCBs and lead. Based on this designation and MDEP's unwillingness to propose a workable process under which they would license the concrete to be disposed of on-site, Gerber recommended to SWEC and Maine Yankee that disposal of concrete on-site, as initially proposed, was no longer feasible.

Soon thereafter, Kane wrote Meisner a letter stating that changing the process from rubblizing concrete and burying it on-site to shipping the concrete off-site was outside the scope of the project and was a substantial cost-increase.[8] SWEC's position was that they had proposed to rubblize the concrete and leave it on-site, and that MDEP's actions constituted a change in regulation, a different and new interpretation of the law, and therefore was a contract scope change. They base this position, in part, on one of the answers to questions in the Decommissioning Agreement. Question 196 asks "if the rubblization approach were not accepted by the regulators," would a scope change be required? SWEC's answer to that question was that if more restrictive regulations are imposed, subsequent to their proposal, which require a more costly approach, a scope change would be required. Maine Yankee insisted that because SWEC had contracted to meet the State of Maine regulatory requirements and because it was not a new law, but merely a

---

8. SWEC identified the "special waste" issue to Maine Yankee as early as August 25, 1999, when SWEC first became aware that the State of Maine was considering deeming the concrete special waste. In a letter on that date, Lepisto wrote that such a determination would increase SWEC's cost, delay the project, or prevent them from using rubblization plan. He concluded, therefore, that it would fall outside the scope of SWEC's work and would constitute a change to the contract.

new interpretation of a law, it was included in the scope of the work under the Amended RFP of the Decommissioning Agreement. Irrespective of SWEC's answers to questions in the proposal, the Decommissioning Agreement that the parties entered into did not provide that changes in the *interpretations* of law constituted a change in law under the force majeure clause.

As of the time of termination, this issue continued to be disputed by the parties. After contract termination, on September 27, 2000, Burke prepared a concrete disposal cost study setting forth various options for concrete disposal. The option that they chose based on cost, practicality, and likelihood of regulatory approval was to ship all of the radioactive concrete to a company called Envirocare in Utah and to ship all of the clean concrete to a landfill in upstate New York. The projected cost of that option is $18.4 million and as of the time of trial, Burke estimates that this projection remains accurate.

### 2. *The Clean–Up Standards Issue*

As noted above, the NRC promulgates various standards to regulate the clean-up of radiologically contaminated sites. These standards are expressed in "millirem plus ALARA." As various witnesses explained, the millirem figure measures the level of allowable radioactive dose that a resident farmer who lives on the site would receive in a year's time from all sources on the site, including soil, groundwater, growing and eating crops and livestock, etc. ALARA means "as low as reasonably achievable." Thus, ALARA requires the site to be cleaned up to an even stricter standard than that expressed by the millirem figure, if a lower

millirem dosage can be achieved in a reasonably cost-effective manner. The NRC clean-up standard at the time of the Decommissioning Agreement was 25 millirem plus ALARA.

Under the base proposal of the Amended RFP of the Decommissioning Agreement, which was priced at approximately $250 million (and later amended to $252 million), SWEC was to perform the decommissioning in a manner that achieved Green Field and fulfilled all the requirements of the contract documents. The Amended RFP defined "Green Field" as below the 25 millirem plus ALARA NRC standard. In SWEC's proposal, it noted that it sought to achieve radioactivity levels of 20,000 DCGL,[9] in order to give Maine Yankee the confidence that SWEC would be able to achieve the required 25 millirem plus ALARA limit. A number of SWEC's witnesses noted that one can calculate DCGLs far greater than 20,000 disintegrations per minute, while still achieving 25 millirem plus ALARA.

Thomas Nauman testified that the 20,000 DCGL was simply a guideline limit and not a contract requirement. Rather, SWEC committed to the 25 millirem limit as the required standard.

His conclusion is supported by the contract documents. First, in response to Maine Yankee's Question 86 during the bidding process, SWEC stated that the 20,000 DCGL value was "not intended to be construed as a release limit," but clarified that it was intended to calculate DCGL values "commensurate with the stated release goal of 25 millirem/year." SWEC also stated, in response to Question 2, that "decontamination efforts will remediate any remaining radioactive mate-

---

9. DCGL and millirem are mathematically related to each other. Several witnesses explained that measurements expressed in

terms of DCGL can be converted to measurements in millirem.

rial present to established DCGL values commensurate with the site radiological release goal of 25 millirem/year." SWEC's answers to Maine Yankee's questions are incorporated in the Decommissioning Agreement as Schedule 1.

Second, the Amended RFP defined "decommissioning" as "all activities necessary to achieve Green Field ... includ[ing] without limitation decontamination, dismantlement, removal and disposal of materials ... all activities and approvals necessary to design and build the .... ISFSI ... at the 25 mR + ALARA or other standard as may be established pursuant to a Change ...." The 25 mR + ALARA standard is also referenced in sections of the contract defining the work scope of the decommissioning.

Moreover, in addition to the base proposal, SWEC was required to include in its offer proposal information responsive to seven "mandatory alternatives," which Maine Yankee defined as "variations on the Base Proposal which Maine Yankee believes may have a material impact on the Base Proposal Price." One such mandatory alternative, number six, asked SWEC to provide an adjusted base proposal price assuming that the standard for achievement of Green Field is 15 millirem plus ALARA.[10] instead of the 25 millirem standard of the base proposal. SWEC's response, attached as Appendix F to the Decommissioning Agreement, indicated that depending on when it was notified of the change in standards, the total contract price increase would range from $3.9 to $6.3 million. Nauman testified that meeting a stricter standard was more costly because it required additional decontamination work on the surface of the concrete, additional soil removal, and additional surveys.

In early 2000, new legislation was passed in Maine that requires the cleanup levels to be reduced from 25 millirem plus ALARA to a 10 and 4 millirem plus ALARA ("the 10/4 standard"). Under this standard, the maximum dosage that a resident farmer living, working, and eating from the land could receive from all sources was 10 millirem. Of that 10 millirem maximum dosage, only a 4 millirem dosage can come from groundwater. Prior to the passing of this legislation, Maine Yankee had been in negotiations relating to standards issues with the State of Maine regulators, legislators, and other stakeholder groups. According to Michael Meisner, Maine Yankee ultimately agreed to accept the 10/4 standard, that was later passed into law, in order to head off even stricter pending legislation that would have vastly increased the costs of decommissioning.

On September 29, 1999, Maine Yankee sent SWEC a letter requesting SWEC to provide an estimate of the cost and schedule impact to the project if the standard were reduced to meet the 10/4 standard and a DCGL level of 5000. As Maine Yankee's negotiations with the State continued, they requested estimates from SWEC based on a host of different assumed standards. Over the course of the next few months, SWEC and Maine Yankee exchanged correspondence relating to various cost estimates and pricing options. Ultimately, in February 2000, SWEC delivered to Maine Yankee a detailed cost estimate for moving to a 10/4 standard of $11 million.

At that time, however, the parties began to dispute whether moving to a 10/4 standard was within the scope of the existing Decommissioning Agreement, or whether it was an out-of-scope change that would

**10.** This is a standard that was being advocated at the time by the EPA.

require additional compensation. Maine Yankee, through an April 10, 2000 letter from Michael Evringham, stated that it was Maine Yankee's understanding based on a report generated by Gerber that the current scope of work coupled with "certain administrative controls" would support the 10/4 standard. SWEC disagreed, stating that "the new legislation defining the radiological release criteria of 10 mR/year and 4 mR/year [is a] change in the scope of work · ... [that] require[s] additional compensation" to be made to SWEC. In a subsequent letter by Evringham responding to SWEC, dated May 17, 2000, Evringham stated that:

> Maine Yankee agrees that remediation to support a 10 mR/year and 4 mR/year groundwater site release differs from the defined scope of work in the now terminated Contract Agreement. However, it seems highly likely that the State's regulation of SWEC's plan to rubblize concrete would have resulted in SWEC achieving the lower standard in any event .... Moreover, it was SWEC's failure to properly plan for and address the regulatory requirements with respect to its plan to rubblize that compelled Maine Yankee to take action.

Thus, as of termination of the Decommissioning Agreement, and to this day, the parties continue to dispute whether this change is a compensable change under the contract.

### E. *Maine Yankee's Termination of the Decommissioning Agreement*

#### 1. *SWEC's Alleged Failure to Perform*

On November 18, 1999, Maine Yankee sent SWEC a letter giving formal notice of default under Article 11.2 for failure to perform under the Decommissioning Agreement. Maine Yankee stated that SWEC "failed to substantially perform its obligations with respect to the performance of the Work and is in material breach of the terms of the [Decommissioning Agreement]" and demanded that SWEC take action to remedy the deficiencies in its performance. Maine Yankee identified a number of breaches that supported its conclusion that SWEC had failed to perform under the Agreement: (i) SWEC's failure to pay its subcontractors and suppliers for work previously performed; (ii) SWEC's failure to provide properly filled out lien waivers (according to Maine Yankee, the lien wavers erroneously represented that all of its subcontracts had been paid in full for the work); and (iii) the notice that one of SWEC's major subcontractors was considering suspending all work as a result of SWEC's failure to pay in a timely manner. Further, Maine Yankee requested information about the possibility that SWEC and its parent corporations may have been insolvent. Maine Yankee withheld payment of SWEC's October invoice until SWEC provided evidence that it would cure the alleged breaches.

On November 30, 1999, in response to the November 18, 1999 letter, Maine Yankee and SWEC entered into Addendum No. 3 of the Decommissioning Agreement. By that agreement, SWEC agreed to provide corrected lien waivers and certified statements from certain suppliers for overdue amounts and to meet periodically with representatives of Maine Yankee. Further, SWEC had to provide lien waivers "from all subcontractors whose contract/order price on the date of the invoice was greater than $100,000 and from all other Suppliers whose contract/order price on the date of the invoice is greater than $250,000." In exchange, Maine Yankee agreed to make payment to SWEC no more than one business day after receipt of the revised lien waivers and certifica-

tion. On December 1, 1999, Maine Yankee wire-transferred most of the money due under the November 4 and 5, 1999 invoices.

On February 7, 2000, Maine Yankee sent SWEC a letter containing the subject line: "RE: ISFSI Cask Material Procurement and Fabrication, SWS–MY–000309." The ISFSI cask is a containment area for spent fuel storage. The letter details Maine Yankee's concerns about the cask and SWEC's failure to create and distribute a detailed project schedule as required by the Decommissioning Agreement. On March 28, 2000, Maine Yankee sent a letter to SWEC detailing further concerns about the lack of a schedule for Reactor Vessel Internals Segmentation ("RVIS") activities. The letter describes the need to integrate the RVIS activities into the main project schedule.

Despite these concerns, from October 1999 through March 2000, SWEC continued to submit invoices to Maine Yankee pursuant to the Decommissioning Agreement. Maine Yankee paid the amount due under these invoices. The parties continued to perform their respective obligations under the Agreement until May 2000.

### 2. *SWEC's Insolvency*

In the Pretrial Order the parties stipulated that on May 1, 2000, and at all times thereafter, SWEC was "insolvent" within the meaning of Article 11.1(1) of the Decommissioning Agreement and within the meaning of 11 U.S.C. § 101(32)(A).[11]

By the year 2000, Maine Yankee was having serious concerns about SWEC's solvency. Michael Thomas of Maine Yankee testified that one of his job responsibilities was to track the financial condition of

SWEC. In connection with that, he reported that at the end of April 2000, he received a copy of a press release issued by SWINC, which detailed the increasingly troubled financial condition of SWINC.

Thereafter, Thomas attended a meeting in Boston with officials of the Stone & Webster companies. According to Thomas, "as the meeting developed, it became clear that Stone & Webster was in a very serious financial condition ... [and] the seriousness continued to impress me during the course of the meeting." Thomas realized that Stone & Webster was considering bankruptcy and that it was struggling to meet the project payables for the Maine Yankee project at the SWINC level. In fact, SWINC's James Carroll testified that during that meeting, there was an exchange between Maine Yankee's bankruptcy counsel, George Marcus, and the Stone & Webster executives in which Marcus asked if Stone & Webster was contemplating bankruptcy. Carroll replied that they were considering all avenues. Marcus explained that Maine Yankee did not want to become involved in a bankruptcy as an executory contract, which could be assumed and assigned to another contractor in the bankruptcy proceedings.

Thomas reported his concerns as to the financial condition of the Stone & Webster companies to the Board of Maine Yankee in a memorandum on May 1, 2000. On that date, Maine Yankee sent a letter to SWEC regarding SWINC and SWEC's financial situation. In the letter, Maine Yankee asserted that it had notified SWEC in the November 18, 1999 letter of potential breaches of the Agreement and advised SWEC that Maine Yankee might

---

**11.** Curiously, at the close of Maine Yankee's case, counsel for Debtors retracted this position, by arguing that Maine Yankee had failed to meet its burden in proving SWEC's insol-vency because it never differentiated between the Stone & Webster companies and never ascertained whether SWEC or SWINC was insolvent.

terminate the decommissioning agreement because of SWEC's potential insolvency. Further, Maine Yankee stated: "This past weekend's press release and the news reports about Stone & Webster, Inc., demonstrate that, despite your attempts to improve your financial situation, SWEC remains insolvent." Maine Yankee also informed SWEC that it "remains in default of the [Decommissioning Agreement] and its efforts to cure since the November 18 letter have not remedied the material breaches of contract." Although Maine Yankee did not terminate the contract, it reserved the right to do so.

### 3. *Maine Yankee's Termination of the Decommissioning Agreement*

On May 4, 2000, Maine Yankee sent SWEC an official notice of termination under Article 11 of the Decommissioning Agreement. According to that letter, Maine Yankee terminated the Agreement because of SWEC's insolvency and SWEC's failure to cure the defaults identified in the November 18, 1999 and May 1, 2000 letters. Specifically, Maine Yankee stated that SWEC had not provided an acceptable project schedule, had not made adequate progress in completing the work, had not obtained the necessary regulatory approvals, had not administered the work, had failed to provide adequate assurances of its ability to complete performance, and had failed to pay its subcontractors and suppliers as required by the Decommissioning Agreement. At the time of the termination, Maine Yankee had paid SWEC approximately $58 million in earned value payments under the Decommissioning Agreement.

Also on May 4, 2000, SWEC sent to Maine Yankee its monthly invoice for April 2000 in the amount of $6,328,314. SWEC did not provide the required lien waivers from the subcontractors with the invoices and admits it had not paid the subcontractors at the time. In fact, Burke testified that on the morning of May 4, 2000, he voided lien waivers that Carroll had signed (indicating that the subcontractors had been paid), because, he stated, "they were not correct"—the subcontractors had not all been paid—and he didn't want to repeat the mistake with the lien waivers made in November, 1999. Burke testified that as of April 30, 2000, SWEC was $50,000 behind in payments to subcontractors, but by the time of termination that amount had risen to $1.7 million. Burke also testified that according to the project accountant, he did not expect to get any money from the company in the near term to help it meet its payment obligations.

On May 9, 2000, SWEC sent a letter to Maine Yankee regarding the May 4, 2000 termination notice. The letter detailed grounds under which SWEC would continue to provide services on the Maine Yankee project until June 30, 2000.

On May 10, 2000, the parties entered into the Interim Service Agreement, under which SWEC continued to work on the decommissioning on a temporary basis. That agreement ran from May 4, 2000 to June 30, 2000 and laid out terms "to mitigate the damages and adverse consequences of an abrupt or inefficient demobilization at the Maine Yankee site as a result of [the May 4, 2000 termination notice] and other contested issues among the parties ...." In essence, the parties agreed to perform as they would have under the Decommissioning Agreement for the duration of the Interim Service Agreement, except that the payment structure under the Interim Services Agreement was completely modified. SWEC agreed to continue work on the decommissioning based on a modified schedule approved by Maine Yankee. Whereas under the Decommissioning Agreement, Maine Yankee

paid SWEC on an earned value basis and SWEC would then be responsible to pay the subcontractors, under the Interim Services Agreement, Maine Yankee paid charges and reimbursable costs directly to the subcontractors and paid SWEC on a cost reimbursement basis.

Thus, after termination, pursuant to the Interim Services Agreement, all subcontractor bills then due and owing were submitted for payment to Maine Yankee. Maine Yankee agreed to pay $5,100,789.36 to subcontractors, suppliers, vendors, and consultants for goods and services provided prior to May 1, 2000, and in exchange SWEC agreed to provide the appropriate lien waivers with respect to all work in the April 2000 invoices. Despite these modifications and concessions, the parties expressly stated that they retained their rights under the Decommissioning Agreement.

### 4. SWINC and SWE&C's Purported Tender of Performance

On May 30, 2000, Maine Yankee's contracts manager, Michael Evringham, sent a letter to Ken Jenkins, assistant general counsel for both SWINC and SWE&C. In that letter, Maine Yankee demanded that SWINC & SWE&C "honor and fulfill their obligations guaranteeing the performance of [SWEC] under its agreement with Maine Yankee ...." Evringham testified that he did not expect SWINC and SWE&C to be able to fulfill those obligations, but sent the letter to reserve his rights as to the guaranties.

Evringham received a response to Maine Yankee's demand on behalf of both SWINC and SWE&C by letter the following day. The letter was signed by Jerry Kane, who had been in charge of the Maine Yankee project since December, 1999. Evringham testified he did not know or understand how or whether Kane was related to or in a position of authority with the parent companies. Kane's May 31, 2000 letter disputed whether SWEC's obligations under the Agreement were terminated and refused either to "admit or deny liability for any 'damages and costs' arising from the termination[,] particularly because no ... bill of costs has been tendered." The letter went on state, however, that

> the Guarantors want to work with all parties to mitigate the damages for whomever may ultimately be liable. The Guarantors are ready, willing, and able to complete the obligations of the Contract Agreement, and the Guarantors hereby tender their performance to complete the work of the Guaranteed.

In closing, Kane requested Maine Yankee's acceptance of this "tender" and stated that SWINC and SWE&C considered "themselves discharged from any further obligations under the Parent Guarantees" if Maine Yankee did not accept the tender.

Wayne Norton testified that within days of receiving the letter from SWINC and SWE&C, Maine Yankee learned that those companies were also expecting to file for bankruptcy. Norton explained that because the parent companies had already or were about to join SWEC in insolvency and no one from SWINC or SWE&C ever attempted to explain or give assurances to Maine Yankee that they could perform the scope of work required under the Decommissioning Agreement, Maine Yankee did not consider these "tenders" to be serious tenders of performance. He indicated that Maine Yankee did not investigate whether SWINC or SWE & C could perform, because it did not delineate between the financial capacity of SWEC, SWINC, or SWE&C.

Both Norton and Evringham explained why Maine Yankee would not want its major contractor to be bankrupt or insol-

vent. First, the nuclear decommissioning arena is a very public one. If its decommissioning contractor were in bankruptcy, Maine Yankee could be subjected to heightened public scrutiny from regulators and other interested parties, called stakeholder groups, questioning whether the decommissioning effort is proceeding in the most careful manner from an environmental and safety perspective or merely proceeding in the least expensive manner. Second, dealing with subcontractors, suppliers, and the contractor's employees becomes very difficult when the contractor does not have the ability to pay those parties on time. Third, performance would be difficult if certain assets are sold and key employees leave the contractor's employ. Fourth, in bankruptcy the Decommissioning Agreement, as an executory contract, could be assumed and assigned to a contractor that is not up to Maine Yankee's standards. For these reasons, the Decommissioning Agreements included provisions that allowed Maine Yankee to terminate the agreement for cause upon the contractor's insolvency or bankruptcy.

It is the Debtor's position that SWINC and SWE&C could have complied with their tender of performance. In this regard, Carroll testified for the Debtors that SWINC was solvent in late May and early June of 2000, and remained solvent until the First Day Filings of its bankruptcy on June 2, 2000. At the time SWEC was operating on site at the Maine Yankee project under the Interim Services Agreement, and Maine Yankee had made it clear to the Debtors that they were contemplating bringing damages claims against them. Carroll reported that after the termination of SWEC, SWINC made efforts to regain control of the Maine Yankee project in hopes of minimizing Maine Yankee's damages claims against it. First, SWINC entered into an agreement with a company called Jacobs Engineering Group, which intended to buy substantially all of the assets and liabilities of SWINC, including all of its non-rejected executory contracts. As part of the agreement, Jacobs extended a $50 million line of credit to SWINC. Ultimately, it was the Shaw Group—and not Jacobs—that purchased the assets and liabilities of Stone & Webster in a bankruptcy auction. Prior to the auction sale in which Shaw bought the Debtors, however, the Debtors were also trying to make arrangements with Shaw to acquire the Maine Yankee project in a deal where Maine Yankee would agree to waive its claims against the Debtors. In that deal, which was never consummated, the Debtors contemplated contributing a certain amount of money towards Shaw's purchase.

Carroll confirmed, on cross-examination, that during the late May—early June time frame he reported to the Board that SWINC was having severe liquidity problems, and that if they had not received the line of credit from Jacobs they may not have had enough cash to pay its bills that were coming due. Indeed, SWINC's bankruptcy filings on June 2, 2000 stated that the sale of its assets and liabilities, at the time contemplated to be to Jacobs, would be necessary to allow SWINC to continue as a going concern.

F. *Stone & Webster's Bankruptcy and Maine Yankee's Claims*

On June 2, 2000, SWINC, and certain of its affiliates, including SWE&C and SWEC filed voluntary petitions for bankruptcy relief. On August 23, 2000, Maine Yankee filed a proof of claim in this case against SWEC. At the same time, Maine Yankee filed nearly identical proofs of claim for $78.2 million against SWINC and SWE&C, based on their guarantees.

In addition to the instant litigation against the Debtors, Maine Yankee has also proceeded against SWEC's bonding company, Federal Insurance Company, in Federal District Court in Maine, to recover amounts under the payment and performance bonds. *See Federal Ins. Co. v. Maine Yankee Atomic Power Co.*, 183 F.Supp.2d 76 (D.Me.2001). Maine Yankee had put Federal on notice of the termination of the Decommissioning Agreement, but Federal had denied Maine Yankee's request for payment. As noted above, the parties recently have settled this suit. Under the settlement, Federal is going to pay Maine Yankee $38.1 million under the performance bond and $5.8 million under the payment bond.

Due to the court's prior ruling that Maine Yankee's claims are limited by the $65 million damages cap in the Decommissioning Agreement and due to settlement recoveries in the amount of $44 million that Maine Yankee has obtained from Federal Insurance concerning this matter, Maine Yankee now seeks $21 million in damages jointly and severally from the three Debtor entities.

### G. *The Shaw Group Bid for the Maine Yankee Project*

Norton, Kane, and Shaw's CEO, Jim Bernhard, testified about the Shaw Group's bid for the Maine Yankee decommissioning project.

In July 2000, Norton and Meisner received a phone call from Bernhard, the CEO of the Shaw Group. Kane, now employed by Shaw, reported that he was on the line on Bernhard's end. Shaw was one of the new suitors—and the eventual winning bidder—for Stone & Webster's assets in their bankruptcy proceedings. Bernhard, who has the reputation of being a deal maker, proposed a settlement agreement whereby Shaw would take over a slightly modified scope of work for completing decommissioning in exchange for $30 million more than Maine Yankee had agreed to pay SWEC (minus what Maine Yankee had already paid to SWEC) and an agreement that Maine Yankee would waive its claims against Federal Insurance and the Stone & Webster companies. He wanted to make a quick deal with Maine Yankee instead of going through the conventional bidding process to get the work. This conversation lasted roughly five minutes.

Bernhard testified during his deposition that he had doubts as to whether they would have executed a deal even if Maine Yankee had said yes to his proposal, because "this was a huge document we were expected to sign and we were never going to sign it." He also confirmed that his offer included a requirement of releasing claims against Stone & Webster and Federal. He also stated that his offer did not contemplate simply substituting a new price, but taking the same terms and conditions to which SWEC had agreed. Rather, he wanted to change some of those terms and conditions.

After the phone call, Meisner instructed Norton to explore the details of a deal with Shaw. The parties exchanged correspondence, with Norton writing to Bernhard's assistant Tim Barfield to "respond to the proposal that Jim made to resolve various outstanding issues and disputes among SWEC, Maine Yankee, and Federal by having the Shaw Group complete the decommissioning of the Maine Yankee site in Wiscasset, Maine." Thereafter, Barfield forwarded to Maine Yankee Shaw's first written term sheet for the purpose of negotiating a deal. The term sheet expressly stated that it was not an offer that could be made binding by acceptance. It carried an increased price of $56 million, a number

of scope exclusions,[12] and an express provision requiring Maine Yankee to "reach[ ] a resolution of all issues between it and Federal Insurance Company ... including without limitation, Maine Yankee's rights to compensation under the performance and payment bonds issued by Federal." Reluctant to waive its claims or change the scope of the decommissioning project, Maine Yankee ultimately turned the deal down, but invited Shaw to engage in its rebid process along with a number of other contractors.

### H. Maine Yankee's Post–Termination Self–Performance of the Decommissioning

During the Summer of 2000, Maine Yankee reissued RFPs to a number of contractors, including Bechtel, Cianbro, and Shaw.[13] Independent of soliciting bids from outside contractors, Maine Yankee also prepared its own estimate of what it would cost to assume the contracting responsibility for itself and self-perform the decommissioning. This self-performance estimate was weighed against the incoming bids from contractors to determine whether to hire a new contractor to complete the work or whether it should self-perform. Maine Yankee hired Scientech as a consultant to help it to develop its self-performance bid and to select between the various contractor bids and its self-performance bid.

At the request of Norton, Maine Yankee's project controls manager, Todd Smith, developed the self-performance estimate. He testified that he included labor costs, the remainder of negotiated subcontractor work, and costs to complete all the sub-projects necessary to clean the site (e.g., above grade concrete disposal, RCRA closure plan, scabbling of below grade concrete, etc.). The self-performance estimate calculated a total cost to complete the decommissioning project of approximately $325 million, excluding contingency.[14] Smith estimated the contingency at $12 million, by applying 15% to the remaining work and then adjusting downward based on certain risk assessments. Thus the total self-performance estimate that was compared to the contractor bids was $337 million.

By that time, the market for nuclear decommissioning had changed dramatically. Whereas at the time Maine Yankee entered into the Decommissioning Agreement with SWEC, the anticipated number of decommissioning projects led to interest by bidders to land a large high-visibility decommissioning project, by Fall of 2000, the market had waned. Plans to decommission a number of plants had been aborted. Accordingly, Maine Yankee was "uncertain as to whether or not the market was going to provide ... an opportunity to have a cost-effective turn-key contract as [it] had [with SWEC]." Some contractors failed to respond with a bid, and Maine Yankee received only a few bids on the decommissioning work. Of those that responded, the Shaw Group's bid was deemed technically unacceptable, because

**12.** These included that Shaw was to be compensated for the costs of soil removal/disposal in excess of 100,000 cubic feet, the costs of concrete removal/burial in excess of some unspecified amount, the costs to remediate unknown or unidentified hydrocarbons and any other differing site conditions, and any costs associated with delays attributable to regulatory authorities for permitting and licensing activities.

**13.** Since Shaw had purchased the assets of Stone & Webster, the contracting arm of Shaw was operating under the name Stone & Webster, a Shaw Group Company. For clarity, the court will refer to this company simply as Shaw or the Shaw Group.

**14.** This is $72 million more than the cost of the Decommissioning Agreement.

Shaw would not accept the full work scope and sought to exclude a number of issues, including licensing and RCRA closure. The remainder of the bids were not as cost-effective as Maine Yankee's estimate for the cost of self-performance. According to Edward Doubleday, who was employed by Maine Yankee as a consultant to help evaluate the bids, "the self-performance was clearly the choice . . . The nearest [technically qualified] bid, I believe, without looking at the details was about a hundred million [dollars] more than the self-performance estimate."

Because Maine Yankee decided that the self-performance option was the cheapest solution, it elected to implement that solution instead of hiring another contractor to manage the work. Under the self-performance plan, Maine Yankee would step into SWEC's place and manage the project and the subcontractors. Maine Yankee employed a number of consultants from a company called Entergy, including Raymond Burke, to help run the project. It set up an organization, headed by Burke, to fill the role of contractor and carry out the dismantling and decontamination work. SWEC's existing subcontracts were assigned to Maine Yankee pursuant to the provisions of Article 11.3 of the Decommissioning Agreement. Maine Yankee assumed SWEC's role in managing all of the then-existing subcontracts and in entering into new subcontracts and change orders to complete the decommissioning work. Smith reports that Maine Yankee is currently tracking its budget and is on schedule to complete the project six months later than the Decommissioning Agreement.

During Evringham's testimony, he reported that it was his responsibility to manage all of the subcontracts for Maine Yankee going forward. The remaining decommissioning work involved a number of projects including moving spent fuel to the ISFSI, waste disposal, site remediation, demolition, and radiation protection. Evringham testified about Maine Yankee's decisions to enter into certain subcontracts and change orders, such as with a subcontractor called NAC to complete "pool to pad" work relating to the ISFSI fuel canisters. Paul Plante, Maine Yankee's project manager for cask loading and fuel transfer, also testified about Maine Yankee's decision to enter into the subcontract with NAC. Plante also testified about Maine Yankee's costs on fuel canisters. Under the Agreement, SWEC was obligated to provide canisters to store spent fuel based in an amount corresponding Maine Yankee's estimate of the amount of spent fuel.

David Holbert was the logistics project manager in the waste management group at Maine Yankee. He testified about Maine Yankee's self-performance in the waste disposal area. Holbert reported that Maine Yankee assumed responsibility for a number of waste management contracts that SWEC had entered into prior to termination. Maine Yankee also entered into several waste management subcontracts itself after termination. Holbert testified that he prepared waste disposal forecasts on a component-by-component basis, based on actual waste streams on the Maine Yankee site, in order to project the total waste disposal costs.

Nauman testified for the Debtors on these topics. He reviewed a number of the change orders entered into by Maine Yankee, and concluded that by entering into these change orders Maine Yankee increased the scope of work beyond the scope that SWEC had been obligated to perform under the Agreement. These included, for example, costs for change orders relating to canisters to store spent fuel for the ISFSI project, RCRA costs, and costs relating to scabbling of concrete.

On cross-examination, however, Nauman confirmed that his understanding of the scope of the work that SWEC was obligated to perform was—in a number of instances—not consistent with the contract documents. In particular, while Nauman stated that it was his understanding that SWEC only had to provide a four fuel canisters to fulfill its obligations, the Agreement requires SWEC to provide all such goods, services, and materials as may be required to perform the work and provides that SWEC is only entitled to a change order for out-of-scope work if the amount of spent fuel in SWEC's inventory exceeded the spent fuel represented in the inventory that Maine Yankee had prepared.[15]

## II. *DISCUSSION*

The court will structure its analysis of the legal issues presented by the trial into two sections. First, the court will discuss whether Maine Yankee properly terminated the Decommissioning Agreement. If it did, SWEC is liable for damages for its breach of the terms of the Decommissioning Agreement. Next, the court will discuss damages and determine what portion, if any, of Maine Yankee's claims should be allowed.[16]

### A. *Liability Issues*

Maine Yankee bases its right to terminate on two provisions of the Decommissioning Agreement for cause. Article 11.1.1 gives Maine Yankee the right to terminate the agreement in the event of the insolvency of SWEC. Article 11.2 gives Maine Yankee the right to terminate the agreement "in the event that SWEC fails to substantially perform or breaches the Agreement."

1. *Did Maine Yankee Properly Terminate the Decommissioning Agreement Under Article 11.1.1 for SWEC's Insolvency?*

█ The parties have stipulated, both in the pre-trial order and at trial, that SWEC was insolvent as of May 1, 2000, and at all times thereafter. The pre-trial order, in ¶ 6 of the section entitled "Statement of Facts Which Are Stipulated and Require No Proof," states that "[o]n May 4, 2000, and at all times thereafter, SWEC was 'insolvent' within the meaning of Article 11.1(1) of the Decommissioning Agreement and within the meaning of 11 U.S.C. § 101(32)(A)." The Debtors also conceded the fact of SWEC's insolvency at trial, and do not waver from this position in their post-trial briefing.

Nonetheless, the Debtors argue that Maine Yankee did not prove "the alleged insolvency" at trial, and thus contend that termination under Article 11.1.1 was improper. Debtors thus contend that the

---

**15.** Attachment A to the Amended RFP memorializes this parties agreement on this issue, stating: "The Contractor shall, for the fixed price of this contract, provide all work necessary to complete all aspect of the ISFSI Specification ... The Contractor shall provide all such goods, services, equipment and materials as may be required to achieve the specified end results ..." Under Section 8.2 of the Amended RFP, however, SWEC could claim extra compensation for the supplying of fuel canisters if SWEC performed its own inventory of the spent fuel pool and that inventory showed that more failed fuel existed than indicated in the ISFSI Specification.

**16.** As part of its damages analysis, the court also will resolve whether the trial proceedings are an estimation proceeding, in which Maine Yankee's claim are treated as contingent in that they converted into an approximate dollar amount but are not yet allowed, or whether instead it is appropriate for trial proceedings to yield a final adjudication on the allowance or rejection of Maine Yankee's claim. *See infra*, section II.B.3.

insolvency of SWEC cannot be the basis for any damages under the Agreement.

The essence of Debtors argument is as follows. Even though SWEC was expressly defined as the "Contractor" in the Agreement, whose insolvency triggers Maine Yankee's right to terminate the Agreement, Debtors argue that Maine Yankee's course of dealing under the Agreement has established that the entire "Stone and Webster" organization—not just SWEC—was the "Contractor" under the Agreement, because Maine Yankee treated all of "Stone & Webster," as the Contractor. The testimony of James Carroll, the president and chief restructuring officer of SWINC, established that "SWINC has always been solvent," despite having "liquidity problems" and difficulties making the May 5th and 12th 2000 payrolls. Debtors reason, therefore, that because Maine Yankee made no showing that "Stone & Webster" was insolvent, Maine Yankee's termination for insolvency was improper.

■ While the Debtors are correct, as a matter of law, a course of dealing can be used to construe ambiguous contractual language, *see Blue Rock Indus. v. Raymond Int'l, Inc.*, 325 A.2d 66, 78–79 (Me. 1974), the contractual language at issue here is not ambiguous. The Decommissioning Agreement clearly states that the "Contractor" is SWEC. Accordingly, it is SWEC's insolvency—and not that of any other Stone & Webster entity—that gives rise to Maine Yankee's right to terminate the Decommissioning Agreement under Article 11.1.1. Based on Debtor's stipulation, SWEC's insolvency is a fact that

needs no proof at trial. Since no one disputes that SWEC was insolvent at the time Maine Yankee terminated the Agreement, the court finds that Maine Yankee properly terminated the Agreement under that section. Based on the court's earlier ruling, in its July 26, 2001 memorandum opinion, Maine Yankee may collect damages under Article 11.4 based on its proper termination under Article 11.1.

### 2. Did Maine Yankee Properly Terminate the Decommissioning Agreement Under Article 11.2 for SWEC's Failure to Perform?

The court will next consider whether Maine Yankee may also collect damages under Article 11.4 based on its termination under Article 11.2 for SWEC's performance failures.[17] Article 11.2 of the Decommissioning Agreement permits Maine Yankee to terminate the Agreement if SWEC breached any material terms of the contract or failed to "substantially perform."

At trial and in its post-trial briefing, Maine Yankee focuses on three independent grounds that it asserts justified its termination of the Decommissioning Agreement for failure to perform under Article 11.2. First, Maine Yankee points to SWEC's failure to pay its subcontractors and suppliers, as required by section 4.2 of the Decommissioning Agreement. Second, Maine Yankee claims that SWEC failed to develop an acceptable project schedule, as required by section 11.9 of the Amended RFP. Last, Maine Yankee argues that SWEC failed to make adequate

---

**17.** While it may seem like the court need not reach this issue, having already found that Maine Yankee's termination was proper under Article 11.1, this issue is relevant both to damages and to Stone & Webster's later-filed adversary proceeding against Maine Yankee in which it alleges that Maine Yankee's purported termination under Article 11.2 was a material breach of the Decommissioning Agreement. Resolving whether Maine Yankee properly terminated the Agreement within the parameters of Article 11.2 will help to resolve that dispute.

progress in completing the project, as required by Article 29.5.1 of the Agreement.

The court will consider each of these grounds in turn.

### a. *Failure to Pay Subcontractors and Suppliers*

■ The court notes at the outset that it appears that Maine Yankee's termination of the Decommissioning Agreement was motivated in large part due to SWEC's insolvency and financial problems. SWEC's failure to pay subcontractors and suppliers flows directly from its declining financial condition. Although it is related to SWEC's financial condition, under the Decommissioning Agreement, the failure to pay subcontractors and suppliers constitutes an independent breach of the Agreement.

Under sections 4.2 and 30 of the Decommissioning Agreement, SWEC was obligated to pay its subcontractors and to obtain written lien waivers. Maine Yankee focuses on two instances where it alleges SWEC breached this requirement. First, in November 1999, SWEC breached this obligation when it submitted inaccurate lien waivers indicating that SWEC had paid certain subcontractors when, indeed, they had not. While SWEC concedes that this "problem" did occur, it points out that it was an isolated incident that was promptly corrected.

Second, by the termination date, May 4, 2000, SWEC was $1.7 million behind in paying its subcontractors and did not expect to be able to pay those debts. This is confirmed by the testimony of Burke and Carroll. Carroll further testified that even if Maine Yankee had paid SWEC's May 4 invoices for $6.2 million which it was not obligated to do until SWEC submitted the lien waivers confirming that the subcontractors and suppliers had been paid SWEC would have used the money to meet its payroll, rather than using the money to pay the subcontractors and suppliers. While conceding that by May 4, 2000, SWEC was $1.7 million behind in payments to its subcontractors, SWEC urges the court to conclude that the $1.7 million amount overdue to subcontractors was nevertheless not material because it represented only 0.67% of the overall contract amount of $252 million.

While it is hyperbole to suggest that SWEC exhibited a pattern of not paying its subcontractors and suppliers, the record it clear that its increasing financial difficulties caused it to fail to pay its subcontractors in a timely manner as of the termination date. Moreover, as of May 4, 2000, SWEC could not pay the subcontractors when due nor could it give assurance of its ability to pay those subcontractors in the future.

The court cannot accept SWEC's argument that the $1.7 million amount owed as of the termination date was immaterial. In this instance, materiality cannot be determined by comparing the amount owed to the overall contract amount. If this were the metric used to determine materiality, very few breaches could be considered material in any contract of this magnitude. Moreover, a close reading of the Decommissioning Agreement, however, demonstrates that such an approach would be inconsistent with the parties' agreed upon obligations and understanding of materiality under the contract.

The original Agreement specified that SWEC would certify timely and full payment to all subcontractors whose subcontracts exceeded $1 million. After SWEC's first failure to pay subcontractors in November 1999, SWEC agreed to put in place mechanisms to ensure that subcontractors would be paid timely going forward. Thus, the parties amended the

Agreement to provide for tighter controls by requiring SWEC to certify timely payment in full on all subcontracts in excess of $100,000.

The $1.7 million amount owed as of the termination date included a number of subcontracts and was well in excess of the $100,000 materiality limit of the Agreement. As Maine Yankee notes, the $1.7 million represents over 25% of the $6.2 million project invoice for SWEC's April services. Under the Agreement, the court cannot conclude that failing to pay that amount when due is immaterial. Thus, the court concludes that SWEC's failure to pay the subcontractors was a material breach of the Decommissioning Agreement.

Whether termination was independently warranted under other two grounds is a closer question. The court next will turn to scheduling and progress matters.

### b. *Failure to Develop an Acceptable Project Schedule*

■ Numerous witnesses for both sides stressed the importance of a detailed project schedule for effectively managing projects of this size and complexity. It is also clear that the development of a comprehensive project schedule was a major substantive requirement of the Agreement. As stated by Norton in his March 16, 2000 letter to Kane, an acceptable schedule ensures that "the project can move forward with the proper tools to support logical decision making and problem identification." Section 11.9 of the Amended RFP sets forth detailed specifications for SWEC's development of a schedule that reflected each task necessary to complete the work and, including all licensing and

permitting tasks, and their associated resource requirements. Under the Agreement, the project schedule was required to be based on "true logic," include the projected completion dates for tasks and the overall project, and avoid "misleading imposed dates."

The parties do not dispute that during the time that SWEC was the contractor on the Maine Yankee project, SWEC never developed a project schedule that was accepted and approved by Maine Yankee. They only dispute which of the parties was to blame for this failure. Maine Yankee points to the fact that SWEC never developed an acceptable project schedule as proof that SWEC breached its obligations under the Agreement, while SWEC maintains that the reason a schedule was never agreed upon is because Maine Yankee unreasonably rejected countless SWEC schedules, making it impossible for SWEC to comply with its contractual obligation.

SWEC argues that the record, particularly the testimony of Boyea, demonstrates Maine Yankee's project schedule requirements were ill-defined and capriciously applied and that every time SWEC sought to resolve the scheduling problems, and was assured by Maine Yankee that only one more change was required, Maine Yankee would come up with new hurdles and issues. SWEC also points to the relative success of its workshop program in gaining piecemeal approval of all but one portion of the schedule, the ISFSI.[18]

In response, Maine Yankee points out that, despite SWEC's machinations to the contrary, no schedule that SWEC had submitted—including the resubmitted schedules for which SWEC purportedly

---

18. SWEC asserts that approval of the ISFSI schedule was stalled by the inability to identify a start date for certain ISFSI construction, which resulted from a lawsuit filed by Maine Yankee against the State of Maine over regulation of radiological issues at the site. The impasse over the ISFSI start date was resolved in early May, after termination.

had satisfied two particular conditions for approval—ever fully complied with the requirements of Section 11.9. Maine Yankee also underscores that Garvey testified that even as late as May 2000, after the workshops, the schedule still contained logic problems that masked the fact that the project was close to nine months behind, was not resource loaded, and lacked a number of work activities, including licensing and permitting tasks. Maine Yankee also notes that even after termination SWEC continued to add required detail to the schedule and that Maine Yankee itself had to add a significant amount of detail, particularly in the areas of ISFSI, RCRA closure, and concrete disposal, after it took responsibility for the schedule in connection with its choice to self-perform.

It is clear that Maine Yankee demanded great attention to detail in the schedule, when reviewing the SWEC schedule submissions for approval. However, Maine Yankee was entitled to demand that, in order to gain its approval, SWEC's schedule strictly comply with the many requirements of section 11.9 of the Agreement. Aside from the fact that Maine Yankee was within its rights to demand compliance with the schedule, it was also reasonable to do so in light of some of the problems on the work site that stemmed from problems with the schedule. For example, witnesses described a number of occasions where activities were performed before requisite permits were obtained. SWEC had problems meeting its obligations in connection with licensing and permitting issues throughout the project.

No evidence shows that Maine Yankee demanded anything of SWEC but strict compliance with SWEC's obligations under the scheduling provisions of the Agreement. Despite the anecdotal evidence regarding Maine Yankee's unreasonableness, no witness for SWEC could confirm that the schedules it submitted for approval ever included the level of detail required by the Agreement.

Early schedules that SWEC submitted did not include all of the licensing and permitting tasks, was not resource-loaded, and included false logic. The new SWEC project management team headed by Kane recognized these shortcomings and implemented a series of workshops beginning in January 2000 in hopes of getting an approved schedule. While it is clear that the workshop program did help the parties to get on the same page on scheduling matters, it did not bring SWEC into compliance with section 11.9. Despite SWEC's efforts, the final SWEC schedule still did not include all work activities, particularly in the area of licensing and permitting, and lacked sufficient details. The consistent inability of SWEC to develop the schedule in this area can be attributed in part to the original mismanagement of Lepisto and in part to SWEC's inexperience with State of Maine regulatory issues.

Moreover, when the details were later added to the schedule, the updated schedule did not reflect the true completion date for the project of July 7, 2005, due to an inappropriate logical constraint that fixed the completion date to the original project irrespective of scheduling logic that compelled a later completion date. While there is contradicting testimony about how this inappropriate constraint was entered into the schedule, the court cannot credit Boyea's speculation that this was the fault of either Maine Yankee or a technical computer problem. Such evidence does not convince the court that it was Maine Yankee's fault that the constraint was entered. Under the Agreement, the ultimate responsibility for the schedule lay with SWEC.

Developing a schedule to the level of detail required by the Agreement for a

project as complicated as the Maine Yankee decommissioning was truly a herculean task. Despite SWEC's efforts, it was a task that SWEC never completed. While the record indicates that but for SWEC's financial problems and impending bankruptcy, it is unlikely that Maine Yankee would have terminated SWEC based on the schedule issues alone, Maine Yankee was technically within its rights to terminate the Agreement for cause due to inadequacies in the schedule.

### c. *Failure to Make Adequate Progress*

■ Maine Yankee contends that a third independent basis for terminating the Decommissioning Agreement for cause was that SWEC failed to make adequate progress in completing the decommissioning work. Under Section 29.5.1 of the Decommissioning Agreement, SWEC was obligated to complete the work in accordance with the milestone schedule provided in Section 4E.1 of the Agreement. That provision required SWEC to complete the physical work of the project by April 30, 2004.

Maine Yankee points to a number of evidentiary bases to support its contention that SWEC failed to meet its obligation to make adequate progress completing the work. First, the April 28 schedule update reflects that as of just prior to termination, SWEC was projecting that the physical work would be completed by January 5, 2005. Second, Kane's testimony and a number of exhibits demonstrate that as of December 1999 the project was "significantly" behind schedule and over budget. Maine Yankee contends that despite some improvements, SWEC's performance under Kane was only marginally better. To support this contention, Maine Yankee notes that according to SWEC's April, 2000 monthly report SWEC had earned

only $20.8 million of the planned $25.7 million (approximately 80%) during the 2000 calendar year. The April 2000 monthly report also reflects that during the month of April, SWEC started only 48% of the tasks and completed only 53% that were intended to be started and completed that month. Last, Maine Yankee notes that these inadequacies when combined with SWEC's financial difficulties at the time and commensurate deterioration of employee morale, loss of job site personnel, and difficulties with subcontractors confirms that SWEC breached its obligations to make adequate progress towards completing the work.

In response, SWEC contends that it did make adequate progress in the work. While it acknowledges that "performance lagged in 1999," it points to SWEC's improvements in progress under Kane as support for its position. SWEC also highlights the portions of Kane's testimony that confirm that Maine Yankee executives praised Kane's work and expressed "delight" with his progress. SWEC also points to its 80% earned value rate in the year 2000 as a relative improvement over its 70% rate for 1999. Last, SWEC notes that the April 2000 monthly report is misleading because SWEC's failure to start and finish otherwise scheduled activities was impacted by actions directly attributable to Maine Yankee. First, SWEC's schedule was being impacted by the lawsuit between Maine and Maine Yankee. Second, April was the month that Kane, with Maine Yankee's strong approval, had given his craft workers and subcontractors a week off to rewards them for their early completion of one of the tasks.

SWEC's performance must not merely be judged relative to their admittedly poor performance in 1999. Rather, SWEC's performance should be judged based on their obligations under the Decommission-

ing Agreement. The fact that prior to the arrival of Kane, the project was saddled with numerous problems and was admittedly over budget, behind schedule, and poorly managed supports Maine Yankee's assertion that overall performance under the contract was not adequate.

While SWEC's performance may have been improving under Kane, the fact remains that the work was not progressing as quickly as it was required to under the milestone schedule in the Agreement. Although Kane testified that Maine Yankee executives expressed delight that the project was finally beginning to progress in an adequate manner, the court does not view these statements as absolute expressions of satisfaction, but as expressions of relative satisfaction in comparison to SWEC's performance in 1999 under Lepisto. The documentary evidence demonstrates that as of the termination date, SWEC had already failed to earn 20% of its projected value during the 2000 calendar year. Schedule documents and Maine Yankee correspondence throughout late 1999 and early 2000 further indicate that Maine Yankee did not agree that work at the project was progressing in a satisfactory manner.

It is clear that, in 2000, the relationship between SWEC and Maine Yankee was improving and SWEC's performance, relative to its earlier performance, was also improving. Despite these improvements, as of the termination date, SWEC was still having problems progressing with the work at the Maine Yankee site and were still substantially behind schedule. The court need not speculate whether if Maine Yankee had not terminated the Agreement, the improvements implemented under Kane would have brought SWEC into compliance or substantial compliance with the Agreement from a progress perspective in the future. As of the termination date, the improvements had not done so— SWEC was behind schedule on the work and was not performing adequately as of May 2000. With the specter of SWEC's increasing financial difficulties, and the corresponding inability to pay subcontractors and to retain its own employees, Maine Yankee had no reason to think that SWEC's performance would improve to an acceptable level.

Just as with the scheduling issue, the factual record on the work progress seems to indicate that but for SWEC's financial problems, Maine Yankee may not have considered termination of the Agreement on these grounds alone. Nonetheless, based on the fact that SWEC was behind schedule and was earning far less than the expected earned value at the time of termination, Maine Yankee was within its right to terminate SWEC on this ground.

### B. *Damages Issues*

Having found that Maine Yankee has established liability for breach of the Decommissioning Agreement and has properly terminated the Agreement under both sections 11.1 and 11.2, the court now turns to assess the proper amount of damages that shall be paid to Maine Yankee. Maine Yankee seeks damages from SWEC based on its breach of the Decommissioning Agreement and seeks damages from SWINC and SWE&C under the terms of their guarantee's of SWEC's performance. As noted earlier, SWINC and SWE&C each guaranteed SWEC's performance "up to fifty percent (50%) of the Agreement's unpaid balance of the contract price," should SWEC "fail[ ] to perform the Agreement."

### 1. *Did Maine Yankee Fail to Mitigate Damages?*

■ As a threshold matter, Debtors contend that Maine Yankee is not entitled

to damages from SWEC, because it failed to mitigate damages in numerous ways. *See Ludington v. LaFreniere,* 704 A.2d 875, 879 (Me.1998) (discussing duty to mitigate damages). Bearing in mind that the Debtors have the burden of proof on the affirmative defense of failure to mitigate, *see Doughty v. Sullivan,* 661 A.2d 1112, 1122 n. 14 (Me.1995), the court will consider each of these in turn.

### a. *Did Maine Yankee Fail to Mitigate Damages By Not Retaining SWEC?*

■ The Debtors first argue that Maine Yankee failed to mitigate because it should have retained SWEC after termination to complete the work. Specifically, the Debtors contend that the parties' agreement to continue the project under the Interim Services Agreement demonstrates that Maine Yankee was interested in retaining SWEC. Debtors also argue that SWEC's ability to perform at that time was bolstered by the improvement in SWINC's financial condition, due to a $50 million line of credit procured from the Jacobs firm. Debtors conclude that Maine Yankee's failure to retain SWEC, even if insolvent, boosted the damages that Maine Yankee now seeks.

Having found that Maine Yankee was entitled to terminate the Decommissioning Agreement due to SWEC's breach, it would make little sense to then conclude that in order to fulfill its duty to mitigate damages, Maine Yankee should not have terminated SWEC in the first instance. As explained by several Maine Yankee witnesses, the insolvency of its contractor was a ground for termination under the Decommissioning Agreement, because insolvency and bankruptcy of a contractor running a large nuclear decommissioning project is undesirable for a multitude of reasons. Where Maine Yankee terminated SWEC for cause under the Decommissioning Agreement, in part due to of its insolvency, the court will not require Maine Yankee to rehire or retain SWEC under a theory of mitigation of damages. Rather, the court must ensure that Maine Yankee made reasonable efforts to mitigate the damages that it may recover from SWEC.

Furthermore, the record does not establish that SWEC would have had the financial wherewithal to perform under the Agreement going forward. The Interim Services Agreement was only a temporary work around that kept the project moving and gave Maine Yankee time to consider what would be its best option for completing the project. By changing the nature of the parties' payment obligations under the Interim Services Agreement, SWEC was able to carry on despite its financial instability and cash flow problems, while Maine Yankee was able to ensure that the project would continue to move forward until it could figure out how to replace SWEC with another arrangement in the nature of the Decommissioning Agreement.

### b. *Did Maine Yankee Fail to Mitigate Damages By Unreasonably Rejecting the Guarantors' Tender?*

■ SWEC next argues that Maine Yankee failed to mitigate damages by unreasonably rejecting the tender of the guarantors of SWEC's performance, SWINC and SWE&C. In a similar vein, SWINC and SWE&C argue that their liability as guarantors should be discharged because SWEC unreasonably refused their tenders of performance such that the guarantors suffered a loss. *See St. Paul Fire & Marine Ins. v. City of Green River, Wyo.,* 93 F.Supp.2d 1170, 1178 (D.Wyo. 2000) (collecting cases); *Restatement (Third) of Suretyship & Guar.,* § 46 (1995) (were the relied-upon tender is an offer by

the guarantor to perform a task rather than merely pay money the guarantor is discharged only to the extent that the guaranteed's refusal both is unreasonable and causes a loss).

Maine Yankee informed SWEC that is was terminating the Agreement for cause on May 4, 2000. A few weeks later it sent a letter to SWINC and SWE&C demanding that the parent guarantors "honor their obligations to Maine Yankee under the two Parent Guarantees." On May 31, 2000, Maine Yankee received a letter signed by Kane. The letter stated that the Guarantors "can neither admit nor deny liability for any 'damages and costs' arising from the termination," but states that they "are ready, willing, and able to complete the obligations of the Contract Agreement, and ... hereby tender their performance to complete the work of the Guaranteed." The letter closes by stating that "if this is not acceptable to Maine Yankee, the Guarantors consider themselves discharged from any further obligations under the Parent Guarantees." Maine Yankee did not accept this tender and disputes whether the May 31, 2000 letter was a tender at all.

Maine Yankee contends that the Debtors failed to prove that Maine Yankee's refusal of the tender was unreasonable, that it caused a loss, or that a tender was even made. First Maine Yankee questions the tender itself. It notes that the signatory to the May 30, 2000 letter sent to Maine Yankee purporting to tender performance was Jerome Kane, who was not authorized to bind SWINC. Next, Maine Yankee argues that the tender itself was ambiguous as to what exactly SWINC and SWE&C would do, and did not tender performance under the Decommissioning Agreement. While the letter indicates that the guarantors would complete the work, it did not state it would do so under

the terms of the Decommissioning Agreement. The testimony of Kane and Carroll indicate that the Debtors contemplated that they would either continue to perform under the Interim Services Agreement or assign the agreement, through the bankruptcy process, to another firm such as Shaw or Jacobs. Last, Maine Yankee contends that even if a valid tender were made, it was reasonable to reject the tender, given that SWINC and SWE&C were themselves on the brink of bankruptcy.

The Debtors advance a number of reasons why they believe that Maine Yankee's rejection of the parent guarantor's tender was unreasonable. They first note that the tender of performance was clear. Kane had authority to bind the companies as an officer of SWE&C and was told by the companies' legal counsel to send the tender. Next, they note that the tender was given under the Decommissioning Agreement, and it was thus unambiguous that the tender of performance was under that Agreement and not the Interim Services Agreement. Debtors point to Kane's testimony indicating that "he would have preferred to go forward with the [Decommissioning Agreement]" rather than "perform under the self-contained self-sufficient model of the [Interim Services Agreement]."

Maine Yankee asserts that it is unclear from the performance tender whether Kane was authorized to tender performance of the Agreement and whether the letter indeed offers to perform under the Decommissioning Agreement. The court is not convinced, that based on these arguments alone, Maine Yankee could disregard the letter. If it had reason to consider the tender seriously, Maine Yankee could easily have ascertained whether Kane had the authority to bind the guarantors and what exactly his letter was offering. That said, despite Kane's expressed

"preference" to continue under the Decommissioning Agreement it is unclear to the court that the Debtors were financially able to do so. But given the circumstances, these arguments are academic. Assuming that Kane's letter did constitute a tender of performance, the court nonetheless finds that Maine Yankee did not unreasonably decline the tenders. Maine Yankee's rejection of any tender from SWINC or SWE&C was eminently reasonable in light of the provisions of the Decommissioning Agreement and the Debtors financial situation at the time.

In order to assess whether Maine Yankee's rejection of the tender was unreasonable, the court must examine the situation confronting Maine Yankee at that time, in late May 2000 and analyze the events that took place from Maine Yankee's perspective. Before entering into the Decommissioning Agreement, Maine Yankee conducted a careful bid selection process to choose a qualified contractor to do the decommissioning. Norton explained the many valid reasons a it wanted to have a financial strong contractor in charge of decommissioning its nuclear power plant. At the end of April, SWINC itself publicly announced that it would be restating its financials, selling its assets, and seeking bankruptcy protection. SWEC failed soon thereafter, as SWEC and SWINC managed their cash flow together. At the end of May, SWINC sent Maine Yankee its "tender," stating that it could and would "complete the work of the Guaranteed." When it received that letter, Maine Yankee knew that SWINC was contemplating bankruptcy, a condition that in and of itself was a breach of the very Decommissioning Agreement that SWINC was saying it would perform. Two days after it sent the letter, the Stone & Webster companies filed for bankruptcy.

As the court noted in its November 21 opinion, the filing of bankruptcy just days after the tender made it "unclear whether either SWINC or SWE&C could have satisfied their guarantor obligations and successfully mitigate Maine Yankee's damages ...." From Maine Yankee's perspective, it was more than fair to conclude that the letter from Kane was a hollow offer for performance that could not be taken seriously, given that being in bankruptcy was itself a breach of the Decommissioning Agreement.

Maine Yankee's termination of the Agreement was itself largely motivated by SWEC's insolvency and the desire to avoid the bankruptcy process. Based on the terms of the Decommissioning Agreement, Maine Yankee was within its rights to terminate SWEC for insolvency and was similarly within its rights to reject tenders made by its parents based on its assessment of those companies' financial weakness and prospects of bankruptcy. Accordingly, the court will not require that Maine Yankee accept the tender of SWINC and SWE&C, companies that were in similarly poor financial condition, in order to mitigate damages or reserve their rights under the guarantees.[19]

19. Nor does the court find that Maine Yankee violated Bankruptcy Code section 365 when it rejected the tender based on the parent companies' financial weakness and prospects of bankruptcy. Section 365(e)(1), which prohibits a non-bankrupt party from terminating a contract because the other party is in bankruptcy, applies by its terms only to executory contracts. The parent companies' purported tender was not an executory contract, but at best was a conditional offer that was not accepted. Moreover, section 365's prohibition against termination of contracts based on insolvency or bankruptcy does not apply to contracts, such as guarantees, to extend "financial accommodations, to or for the benefit of the debtor." 11 U.S.C. § 365(e).

### c. *Did Maine Yankee Fail to Mitigate Damages By Unreasonably Rejecting Shaw's Offer?*

■ SWEC also argues that Maine Yankee failed to mitigate damages by declining Jim Bernhard's offer, made on behalf of the Shaw Group, to take over the scope of the decommissioning agreement for $30 million above SWEC's contract price.[20] In essence, Debtors argue that Maine Yankee should have accepted Shaw's offer and unreasonably failed to do so. Therefore, according to the Debtors, Maine Yankee's damages should be limited to $30 million, which is less than the amount that Federal Insurance has agreed to pay to Maine Yankee on its bonds.

In opposition, Maine Yankee responds that Shaw never made a legal offer. Moreover, even if one assumes that an offer were made, Maine Yankee contends that Debtors have failed to prove that Maine Yankee was unreasonable in attempting to negotiate against that offer and in ultimately deciding to decline Bernhard's proposal. Thus, Maine Yankee argues, its failure to consummate a satisfactory agreement with Shaw was not a failure to mitigate damages.

■ To constitute an "offer" a proposal must be sufficiently defined as to manifest a willingness to enter into a bargain, such that the offeree would understand that its assent to that bargain is invited and will conclude the bargain. Restatement of Contracts § 24; 1 Williston on Contracts §§ 4.4, 4.18; *see also Searles v. Trustees of St. Joseph's College*, 695 A.2d 1206, 1211 (Me.1997) ("it is necessary that the offer shall contain all the terms of the contract to be made"). Rather than characterize the Maine Yankee Shaw's proposal as an "offer," Maine Yankee characterizes the Shaw proposal as a "feeler" for a settlement agreement and a proposal for a new arrangement with Maine Yankee on different terms and conditions. Maine Yankee contends that Bernhard's proposal was lacking, because it left as unspecified what changes there would be to the scope of the work from the scope of work that SWEC had agreed to perform under the Agreement. Moreover, Maine Yankee contends that the terms of Shaw's proposal required a global resolution of all disputes between Maine Yankee, Federal, and the Stone & Webster companies, which Maine Yankee did not want to accept. Both of these aspects of the proposal had to be further negotiated and more fully defined.

The trial testimony and exhibits establish that Bernhard made a proposal to Meisner and Norton that involved Maine Yankee paying Shaw an additional $30 million over and above the unpaid amount to SWEC under the decommissioning project in exchange for Shaw completing the decommissioning project. The parties dispute, however, turns on (i) whether the Shaw proposal contemplated altering the scope of the work that Shaw would perform and altering the Agreement under which it would perform the Work, and (ii) whether the Shaw proposal was contingent on the Maine Yankee agreeing to waive any claims it may have had against the Stone & Webster companies and Federal Insurance. There was, to some degree, conflicting testimony on these matters.

The Debtors rely on the testimony of Bernhard, Meisner, and Kane to establish that Bernhard's proposal was a clear offer, that it involved substantially the same scope of work that SWEC had agreed to perform, and that it was not contingent on

---

**20.** Ultimately, in the process of the parties' negotiations, this oral proposal was memorialized in a written term sheet, for negotiation purposes, which carried an increased price-tag of $56 million.

Maine Yankee's agreeing to waive its claims against SWEC and Federal. The Debtors point out that during his deposition, Bernhard was asked about the offer:

Q: Now, if at the conclusion of your communication that you have talked about with Meisner in July, 2000, Meisner had said, "Bernhard, I accept, we have an agreement," what would you have understood to be the terms of that agreement?

A: We would go out do the contract, collect our receipt, and get an extra 30 million dollars.

Q: What contract?

A: The contract to do the work subject to the negotiation of some terms and conditions, the scope of the work. The only scope differential was one not that existed between us, Shaw and Maine Yankee. It was one that had existed already. Instead of arbitrating at the end whether concrete was in or out, we just wanted to clarify it right then.

Moreover, Debtors highlight that Meisner testified that Shaw "could take the work, you know, the old Stone & Webster scope of work, add around $30 million to do it and continue the project." As for whether the proposal was conditioned on Maine Yankee's waiver of its claims against Federal, Kane testified that Federal was not mentioned in the first phone call between Bernhard and Meisner. Debtors state that is further confirmed by Norton's letter and his notes of the July 14 telephone call, neither of which indicates that a release of Federal was required.

Contrary to the Debtors' assertions otherwise, Norton's trial testimony and Bernhard's deposition testimony establish that Bernhard's proposal did contemplate a global resolution of Maine Yankee's dispute with Federal and SWEC. Bernhard stated that it was his understanding that "if we finished the job for 30 million dollars, there wouldn't be any claims by Federal to Maine Yankee, there wouldn't be any claims by the [Stone & Webster] estate to Maine Yankee, and there wouldn't be any claims to Maine Yankee to both parts [sic]." This confirms that part of Bernhard's objective was to settle any legal claims arising from the dispute under the Decommissioning Agreement. Norton's letter to Barfield, which was drafted immediately after his conversation with Bernhard, also characterizes Bernhard's proposal as one "to resolve various outstanding issues and disputes among SWEC, Maine Yankee, and Federal by having The Shaw Group complete the decommissioning of the Maine Yankee site ...." Norton testified that throughout the negotiation process, he continued to understand that Maine Yankee's term sheet was conditioned on Maine Yankee's resolution of all claims between Maine Yankee, Federal, and SWEC.[21] Given that to agree to the Shaw Group's proposal, Maine Yankee would have had to waive its claims against SWEC and Federal (or settle those claims for less than Maine Yankee believed they were worth), it was not unreasonable of Maine Yankee to try to negotiate with Shaw to drop this requirement and to accept as much scope of work as possible. When this failed, it was not

---

21. Debtors assert that this understanding is belied by Barfield's email to Norton, conveying the $56 million above contract price offer and stating that "our term sheet contemplates a new agreement and allows us to move forward regardless of whether we can come to any agreement with S & W or FIC." In light of Norton and Bernhard's testimony, this statement does not convince the court that Shaw dropped its requirement for Maine Yankee to waive its claims. It may instead refer to Shaw's agreements with SWEC and Federal.

unreasonable of Maine Yankee to decide not to enter the agreement with Shaw at that time.

■ In addition, given the complexity of any agreement to decommission the Maine Yankee facility, Bernhard's oral proposal was not well-defined enough to constitute an offer that Maine Yankee could be expected to accept immediately. The statement from Bernhard that Debtors rely upon to establish that the offer was clear, itself includes that caveat that the proposal was "subject to the negotiations of some terms and conditions." It would unrealistic to presume that Maine Yankee would simply accept Bernhard's telephone proposal without further negotiating the terms to get a complete understanding of the parameters of the deal. Given the level of detail and complexity involved in the decommissioning project, Maine Yankee's course of conduct in affairs regarding the decommissioning project (i.e., the detailed bidding process, the Decommissioning Agreement itself, its careful contract management of SWEC, etc.) suggests that it would first take great care in exploring the parameters of the deal. In negotiating and discussing the deal, that is just what Maine Yankee did.

The court finds that Maine Yankee did not unreasonably decline any oral offer from Shaw, because the details of that proposal were not well defined enough to constitute an offer that Maine Yankee should have reasonably accepted and because doing so would require that Maine Yankee immediately drop or resolve its claims against Federal. Thus, even if the oral proposal were sufficiently detailed to constitute a legal offer, it would have been reasonable for Maine Yankee to discuss the deal in more detail.

Having determined that Maine Yankee did not unreasonably reject Bernhard's oral proposal, the court will next focus on the subsequent negotiations between Maine Yankee and Shaw to determine whether it was unreasonable, based on those negotiations, for Maine Yankee not to have arrived at some agreement with Shaw to take over the decommissioning project. The record shows that Maine Yankee, through Norton's correspondence to Barfield, promptly responded to Bernhard's proposal by immediately forwarding proposed terms and inviting further discussion. Their correspondence culminated in Barfield forwarding to Norton a term sheet, for negotiation purposes only.

Maine Yankee raises two reasons, why, from its perspective, it was reasonable not to accept the Shaw Group's offer. First, as discussed above, their offer carried with it the requirement of a global settlement. Second, the Shaw Group did not want to take on the same scope of obligations that SWEC had undertaken in the Decommissioning Agreement. It is unclear to the court that Shaw Group ever offered or contemplated offering to take on all of obligations of the Decommissioning Agreement. To the contrary, Bernhard himself made clear, in his deposition, that the deal he was proposing was never one where Shaw would take on the "huge document" that was the Maine Yankee/SWEC contract. He stated that "our offer was not to take the same terms and conditions as previously negotiated by Stone & Webster and just substitute an additional price. That was not the offer . . . ." Kane's testimony confirmed this much. At a number of points during his deposition, Bernhard confirmed that the $30 million price did not cover the same scope of work as in the Decommissioning Agreement. Given Shaw's unwillingness to accept the full scope of obligations under the Decommissioning Agreement and Maine Yankee's requirement that it be able to manage the project in a detailed manner, it is not

surprising that the parties never came to an agreement.

In evaluating how to proceed post-termination, Maine Yankee did not ignore the Shaw Group's proposal. Nor did it unreasonably reject that proposal. Rather, the evidence shows that Maine Yankee entertained the Shaw Group's proposal and attempted to negotiate a satisfactory agreement with Shaw, but ultimately concluded that Shaw's requirement that it waive its potentially valuable claims against Federal and SWEC was too onerous. Nothing in the record indicates that this business decision was unreasonable.

Moreover, the court is not convinced that even the final Shaw proposal (as embodied in the written term sheet) contemplated taking on the same scope of work and obligations that SWEC had in its Decommissioning Agreement. That document indicates that Shaw wanted to shift the risk of regulatory delays as well as other costs onto Maine Yankee. The Shaw deal did not simply contemplate taking over the SWEC scope of work; it was a new agreement that allocated risks differently. For the reasons identified, deciding not to consummate a deal with Shaw was a reasonable business decision.

In sum, the court does not find that Maine Yankee's failure to come to an agreement with Shaw was a failure on its part to mitigate damages. Maine Yankee's subsequent actions confirm that it was simply trying to secure a contractor to handle the same scope of work for the best possible price. It determined that the best way to meet that goal is to engage in a re-bid process, by which it solicits bids from a number of contractors and chooses from among the competitive bids and its own self-performance bid. While Maine Yankee determined that accepting the Shaw Group's proposal was not in its best interests, it invited the Shaw Group to participate in its re-bid process and stated that it would be amenable to attempting to agree to a contract based on that process, without tying the agreement to a simultaneous release of its claims against SWEC and Federal. That Maine Yankee engaged in that process, weighing the new proposals from contractors against its own self-performance bid, further indicates to the court that Maine Yankee fulfilled its duty to mitigate.

2. *To What Damages Amount has Maine Yankee Proved It Is Entitled?*

a. *Testimony on Damages*

(i) *Maine Yankee's Expert—Edward Doubleday*

Maine Yankee's damages expert, Edward Doubleday of Scientech, Inc. testified regarding his damages analysis and calculations. Doubleday, who has over twenty-two years of commercial nuclear power experience, performed an independent evaluation of Maine Yankee's damages to arrive at the $81 million pre-cap and pre-settlement with Federal total damages figure. He conferred with Maine Yankee personnel, reviewed the Decommissioning Agreement, and reviewed the various subcontracts and change orders entered into by Maine Yankee to perform the work.

Doubleday's approach was to determine the cost of completion for the scope of work within the SWEC Decommissioning Agreement, and to determine the difference between that costs and the amount that would have been owed to SWEC for completion of that same work had the Agreement not been terminated. Doubleday first calculated the "Total Cost to Complete the Work" based on the various components of SWEC's scope of work under the Decommissioning Agreement. He concluded that the "Total Cost to Com-

plete the Work" would be $275,151,017. Next, Doubleday calculated that the remaining Unpaid Agreement Funds were $194,117,713. This amount is not disputed by SWEC. He then subtracted the Unpaid Agreement Funds of $194,117,713 from the Total Cost to Complete the Work of $275,151,017, to arrive at his damages figure of $81,033,304—the difference between what Maine Yankee is paying to complete the work and what Maine Yankee would have paid to SWEC to complete the work under the Agreement.

Scientech's calculations of the Total Cost to Complete the Work figure was based on the following cost components (approximate calculated cost in parentheses): (i) costs for subcontractors to complete work under subcontracts ($168.7 million), (ii) year 2000 D & D costs ($15.9 million), (iii) cost of labor to complete D & D after 1/1/01 ($55.7 million), (iv) reduction in base cost for oversight of decommissioning agreement (-$7.4 million), (v) disposal of above-grade concrete offsite ($18.4 million), (vi) RCRA closure plan costs ($5.1 million), (vii) costs to remove PCBs less than 50 ppm ($607,000), (viii) small tools and supplies costs ($1 million), (ix) equipment costs ($1.7 million), (x) reprocurement costs incurred in connection with conducting the rebidding process ($482,-000), (xi) additional contingency costs ($9.3 million), (xii) electricity costs for in-scope work ($1.2 million),and (xiii) costs of major purchase orders ($4.2 million).

Doubleday reviewed his calculations of each of the above components at trial. His damages estimate is based on a combination of actual costs (for work already done and subcontracts already executed) and estimates of future costs (for work not yet done).

### (ii) SWEC's Expert—Dennis Staats

SWEC's damages expert, Dennis Staats, testified on damages issues on behalf of the Debtors. Staats reviewed the damages reports produced by Maine Yankee, and testified on the appropriateness of Maine Yankee's methodology and conclusions.

Staats first opined that the "total cost" approach used by Maine Yankee to determine damages is inappropriate for a determination of damages in this case, because it fails "to determine specific impacts to the damages" by identifying and costing out damages components "in terms of incremental amounts." On cross-examination however, after reviewing the steps in Scientech's methodology, he agreed that if the analysis is "done correctly and there is consideration of change orders, to items of negotiation, of questions of whether [certain changes] are in scope or out of scope, whether proper incremental analysis is done for savings, proper present value is done and other adjustments" are made, the methodology would yield a reasonable determination of the damages.

Next, Staats testified that he would make certain adjustments to Doubleday's "bottom line number" of $81 million. He first contested the accuracy of Doubleday's damages analysis, opining that certain costs included by Doubleday were inaccurate and that others were "double counts."[22] On the topic of accuracy, Staats opined that Doubleday miscalculated the base labor savings credit arising from reduced labor costs associated with Maine Yankee's implementation of its self-performance plan. Staats also highlighted

---

**22.** These included costs that are recoverable by Maine Yankee in its litigation against the Department of Energy.

that while Doubleday's report indicated that Maine Yankee, in its self-performance estimate (which was incorporated into its present budget) had determined that a $6 million spending level would be required for RCRA costs, his cost item for RCRA was $9 million. Staats advocated reducing the amount by the $3 million difference. Last, Staats stated that Doubleday failed to discount the damages to obtain a present value damages amount as of the May 4, 2000 termination date. Using a discount rate of 6.69%, the commercial lending rate at the time (based on May 2000 five year treasury bills), Staats performed that analysis. He reported that applying that discount rate to discount to the termination date reduces the $81 million damages figure by $12 million.

Staats' analysis also attacked Doubleday's conclusions on a conceptual level for failure to account for certain issues that a complete damages analysis must include. First, he stated that Doubleday's report failed to perform a delay analysis to determine the cause of the six month delay on the completion date of the Maine Yankee project. Accordingly, he opined that Doubleday's $81 million damages figure has a delay claim against SWEC embedded in it, because Maine Yankee did not analyze the reasons for that delay and allocate the cost of that delay to the proper party. Based only on the monthly labor costs projected over a six month period, Staats valued that delay claim at $2.1 million. Second, Staats stated that Doubleday's waste disposal costs were overstated, because Maine Yankee failed to sufficiently review those costs to determine the cause for the $11 million increase in costs when compared to the value that SWEC had placed on this

item.[23] Third, Staats challenged Doubleday's $9.3 million line item for additional contingency, opining the inclusion of a contingency amount in a damages figure is inappropriate because whether the contingency will be spent is speculative.

### b. The Parties' Contentions on Damages

Pursuant to section 11.4 of the Decommissioning Agreement, SWEC must compensate Maine Yankee for the difference between "the total direct damages and costs incurred by Maine Yankee to finish the Work" and the "unpaid Agreement funds, including any funds payable to Maine Yankee by reason of letter of credit, performance bond, or insurance coverage." According to Maine Yankee, the amount not paid to SWEC under the Decommissioning Agreement is $194,117,700.12, and the total direct damages that Maine Yankee will incur in completing the decommissioning is at least $275,151,017. Thus, Maine Yankee's damages, under section 11.4, would be approximately $81 million.

However, as per the court's November 21, 2000 memorandum opinion, Maine Yankee's breach of contract damages are capped at $65 million, pursuant to section 30.2 of the Agreement. In addition, Maine Yankee has recently entered into a settlement agreement with SWEC's bonding company, Federal Insurance Company, whereby Federal will pay Maine Yankee an aggregate amount of approximately $44 million under the bonds that it has issued. Under the law of the case established by the court's November 21 Order, it is appropriate to credit within the cap the amounts received under the Federal bonds.[24] Accordingly, in its proof of claim,

---

**23.** Maine Yankee had costed this item out at $66 million, while SWEC's earned value report indicated a cost of $55 million.

**24.** This court has interpreted Article 11.4 of the Agreement as mandating that any funds payable to Maine Yankee under its performance bond or insurance coverage are to be

Maine Yankee seeks $21 million jointly and severally against each of the three Debtors.

Maine Yankee relies on Doubleday's Expert Report, his testimony, and supporting testimony and documentation from Gerber and Smith to establish the amount in damages to which they are entitled. It also contends that Maine Yankee's self-performance estimate, actual cost, and budget data support Doubleday's damages estimates.

The Debtors, through the testimony of their damages expert Dennis Staats as supplemented by the testimony of Boyea, challenge Maine Yankee's damages assertions in three ways. First, the Debtors contend that Doubleday's Report should be stricken under Fed.R.Civ.P. 26, for Maine Yankee's failure to fully disclose their expert's opinions before trial. Second, the Debtors assert that Maine Yankee is improperly seeking to recover costs from SWEC that were beyond the scope of the Decommissioning Agreement, including costs relating to the 10/4 legislation, costs for the off-site disposal of concrete due to the State of Maine's "special waste" designation, and costs for certain portions of the RCRA remediation sub-project that were not included in SWEC's contract scope. Third, the Debtors challenge certain cost-items within Doubleday's Report as overstated, unnecessary, or inaccurate.

Debtors contend that the following costs should be subtracted from Maine Yankee's cost estimate: (i) overstated waste disposal costs ($5.9 million); (ii) speculative contingency costs ($9.3 million); (iii) unidentified delay costs attributed to SWEC ($2.1 million); (iv) additional labor savings ($4.85 million) and Entergy savings ($3.4 million); (v) out-of-scope costs to achieve 10/4 millirem ($11 million); out-of-scope costs to

transport above grade concrete off-site due to MDEP's special waste designation ($3.325 million); (vi) out-of-scope costs for RCRA remediation ($2.9 million); (vii) costs due to Maine Yankee's abandoned recovery from Federal ($6.5 million); (viii) present value reduction ($12 million); and (viii) amounts owing to SWEC for work performed prior to termination ($1.67 million). After subtracting out these costs and crediting Maine Yankee's recoveries to Federal, it is Debtor's position that Maine Yankee is owed no damages on its claim.

### c. The Court's Damages Analysis

Before continuing, the court will consider as a threshold issue Debtors' contention that Doubleday's report and related testimony must be stricken under Fed.R.Civ.P. 26(a). The crux of Debtors challenge is that Doubleday omitted from his report the opinions he expressed at trial concerning SWEC's commitment to the 20,000 DCGL standard and that a 20,000 DCGL achieves the 10/4 standard with no additional costs. They also argue that they were surprised by the "bait and switch" of having Doubleday testify at trial on damages, rather than his colleague Dr. Roger Matson, who authored Maine Yankee's earlier damages reports. Last, Debtors contend that his updated report failed to adequate identify all relevant data and opinions.

The court will not strike Doubleday's report or testimony. Doubleday was listed as an expert for Maine Yankee on the pretrial order. To the extent his updated report was somewhat skeletal, Staats testified that he understood that the updated report was generated from earlier reports, which contained more detailed narrative discussions of the expert opinions. As for Debtors argument that Doubleday's report omitted opinions relating to the 10/4 stan-

deducted from damages recoverable to Maine Yankee.

dard that Doubleday testified to, Debtors brought forth sufficient evidence on this point during their case in chief to test this opinion and to allow the court to resolve whether it agrees with Doubleday's opinion on that issue. Thus, to the extent that Doubleday failed to expressly detail in his report his opinion that there were no additional costs to reach the 10/4 standard, the court finds that omission to be harmless.

Speaking broadly, based on its review of the expert reports and relevant testimony, the court finds that the basic methodology used by Maine Yankee—and Doubleday—to calculate damages is reasonable and consistent with the Agreement. Under this methodology, the unpaid agreement funds were calculated by subtracting the amount paid to SWEC as the contractor under the Agreement from the total dollar amount authorized for the scope of work in the Decommissioning Agreement. Doubleday's calculations establish that the unpaid agreement funds are $194,117,700.12. To calculate the pre-cap damages amount owing to Maine Yankee, this amount is subtracted from Maine Yankee's actual cost to complete the scope of work.

Debtors damages case focuses on purported flaws and inaccuracies in the portion of Maine Yankee's damages calculations directed at calculating Maine Yankee's cost to complete the scope of the Work of the Decommissioning Agreement. While Maine Yankee asserts that this amount is $275,151,017, which yields a pre-cap damages amount of $81 million, SWEC contends that the court should discount or reject Maine Yankee's damages request for the reasons identified by Staats.

In order to determine the appropriate damages award, the court must necessarily determine the costs to finish the in scope decommissioning work under the Agreement. As the project is still incomplete,[25] the court as fact-finder must rely on reasonable projections of those completion costs. Indeed, the court is "permitted to make the most intelligible and probable estimate which the nature of the case will permit, given all the facts and circumstances having relevancy to show the probably amount of damages suffered." *Pombriant v. Blue Cross/Blue Shield of Maine,* 562 A.2d 656, 660 (Me.1989).

The court will structure its damages analysis, as follows. First, the court will review Maine Yankee's damages analysis item by item, stopping where necessary to consider Debtors' challenges to those individual line items and to make any adjustments that the court agrees are necessary. Next, the court will consider Debtors' broader challenges to Maine Yankee's damages case and again make any necessary adjustments.

> i. *Analysis of Maine Yankee's Line Item Costs to Complete*
>
> (i) *Costs for Subcontractors to Complete Work*

To calculate the cost for subcontractors to complete the work cost component, Scientech added the costs of contracts then issued ($194 million) with the costs of certain approved (in-scope) change orders ($45 million) and then made certain adjustments to subtract out all items that were accounted for elsewhere in the damages calculations.[26] Many of the subcontracts

---

**25.** As of the time of Maine Yankee's damages expert's analysis, the Work was approximately 50% complete.

**26.** These items include costs associated with separate line items, such as labor costs and the off-site disposal of above ground concrete.

were entered into by SWEC before termination and assigned to Maine Yankee in connection with its self-performance plan. All of the pre-termination and some of the post-termination change orders also were entered into by SWEC.

At trial, Evringham provided summaries of the subcontracts and change orders and described the process that Maine Yankee employed to ensure that the charge orders were appropriate and reasonably priced. He testified that every purchase order or subcontract is reviewed by the project manager responsible for that item, and described that when subcontractors approaches Maine Yankee seeking to be compensated for certain work, it was his job to review their contracts to determined whether that scope of work is already included in their pre-existing subcontract. The contracts and change order summaries are listed in Exhibits 25, 27, and 28. Doubleday's testimony indicates that in calculating the total subcontractor costs, he reviewed these summaries, along with the Decommissioning Agreement, and the SWEC proposal to ensure that none of the subcontractor costs was outside of SWEC's scope of work.

Most of the subcontracts were firm, fixed-price agreements, the cost of which is determined by simply reading the contract. For those contracts that were either time and materials or unit cost contracts (which contain only projections of total cost), Scientech first broke the contracts into groupings for waste disposal, RCRA expenses, and radiological contracts. Then, Scientech performed its own analysis of those three tasks, and adjusted the total time and materials or unit cost projections of those subcontracts accordingly. The analysis showed that Maine Yankee would likely spend $67 million in waste disposal [27] and would spend $9 million in RCRA subcontract expenses [28] (including $3.9 million previously contracted on work that has not yet been done).

Debtors challenge Doubleday's calculations in a number of ways. First, based on Nauman's testimony, they argue that certain of the change orders included in Doubleday's calculations should be excluded, because they covered work that was already within the scope of another subcontract. Essentially, Debtors assert that Maine Yankee unnecessarily wasted money by entering into these change orders, and that SWEC should not be liable for those amounts.[29] In addition, Debtors contend that the cost of certain change orders should be excluded from Maine Yankee's damages calculation, because they concerned work that fell out of the scope of SWEC's obligations under the Agreement. These include change orders executed with Canal Barge, CH 2M–Hill, Chem–Nuclear, and Manafort.

---

**27.** This approximates to the total value for all of the waste disposal subcontracts issued by SWEC, which totaled $66.4 million.

**28.** Gerber testified that based on his analysis the total RCRA costs would be roughly $11 million.

**29.** Debtors also challenge the NAC pool-to-pad change (for moving the fuel to be stored in the ISFSI) order as too costly. The evidence does not support this assertion. The price of the NAC order compares favorably with other bids and is within the range of SWEC's evaluation of what it would have cost to complete that task. Moreover, Evringham explained during his testimony on the matter than contracting with NAC, as opposed to some other contractor, to move the fuel was reasonable, as they were the subcontract providing warranties relating to the ISFSI fuel canisters. These warranties may have been voided if another subcontractor did the work. In addition, Plante's testimony further explains that Maine Yankee's decision to contract with NAC was reasonable, because NAC was familiar with the system and equipment used.

Based on Nauman's testimony, the court cannot conclude that the change orders included in Evringham's summaries covered work that was out-of-scope[30] or repetitive. Nauman's testimony on direct and on cross-examination confirms to the court that he was not familiar enough with the terms of the original subcontracts or the work covered by certain contracts to convince the court of his conclusions. Moreover, in light of the conceded thoroughness of Maine Yankee's contract managers, it seems unlikely that Maine Yankee would waste money by entering into unnecessary subcontracts.

In addition, based on Staats testimony, Debtors seek discounts to Doubleday's calculations of both the waste disposal costs and the RCRA costs. Staats challenges Doubleday's $66 million waste disposal cost calculation by comparing it SWEC's earned value estimation, and pointing out an $11 million discrepancy between those figures. In light of the fact that the waste disposal subcontracts that SWEC itself entered into before termination totaled over $63 million and the fact that Doubleday's report relied on actual data on the quantities of waste shipped thus far than SWEC's earned value report, which had estimated lower quantities of waste, the court concludes that Doubleday's $66 million waste disposal cost calculation is reasonable.[31]

Staats also challenges Doubleday's $9 million RCRA cost calculation, pointing to a $3 million discrepancy between that figure and the $6 million projected in Maine Yankee's budget. Debtors contend a re-duction is warranted, because Maine Yankee will spent approximately $3 million to clean up areas or spills that are out of SWEC's scope of work because they had not been previously identified or characterized.

Again, the court concludes that the RCRA cost calculation is reasonable. First, Doubleday's figure is well in line with what Gerber, a person with RCRA expertise who worked for both Maine Yankee and SWEC on the decommissioning, estimated the RCRA would cost. Gerber testified his estimate represented the projected costs to complete remediation for the areas identified in SWEC's remediation plan or the report of SWEC's remediation subcontractor, Duratek. Thus, his estimates do not include any out-of-scope remediation. Further, the court accepts Doubleday's explanation, his calculations are different from those in Maine Yankee's budget, because when Scientech examined the actual expenditures, subcontracts, and change orders issued through August 31, 2001, it found that the actual RCRA costs were running higher than Maine Yankee had projected in its budget.

### (ii) Maine Yankee Calendar Year 2000 D & D Costs

The second damages component of $15.9 million consists of actual costs already incurred by Maine Yankee for decommissioning from May 5, 2000 through December 31, 2000, such as electricity, fees, labor, materials, supplies, and services. In connection with its self-performance, Maine Yankee set up a system

---

**30.** It should be noted that the court does not consider Debtors challenges to the scope of the Maine Yankee work that relate to regulatory issues—the 10/4 legislation and the "special waste" designation in this section. These challenges will be considered separately infra in section II.B.2.c.ii.(i).

**31.** Maine Yankee's waste disposal costs are also supported by Holbert's testimony, which detailed how Maine Yankee conducted its waste disposal cost analysis. Like Doubleday's independent analysis, Holbert's waste disposal analysis is based on actual waste streams as of September 2001.

whereby they have continued to track the costs of tasks within the work scope of the Decommissioning Agreement. Scientech gathered and reviewed these numbers from Maine Yankee's tracking system, and summarized them in Doubleday's report.

As the Debtors do not appear to challenge this line-item directly, the court finds that they are reasonable and should be included in Maine Yankee's cost to complete SWEC's scope of work.

### (iii) *Maine Yankee Labor to Complete D&D After 1/1/01*

In order to assess the budget going forward, after January 1, 2001, Scientech did an analysis of the manual and non-manual labor costs paid through August 31, 2001, and used those labor rates and staffing numbers to project what Maine Yankee would spend on labor. Scientech calculated that Maine Yankee will spend $55.7 million on labor costs. This amount is roughly $3 million less than Maine Yankee estimated in its own self-performance projection.

The Debtors do not appear to challenge this line-item directly.

### (iv) *Reduction in Base Costs for Maine Yankee's Oversight of Decommissioning*

Scientech also calculated any savings resulting from Maine Yankee's self-performance. Doubleday explained that "when Maine Yankee made the decision to self-perform, the organization that you need for self-performance is different than the organization you need to monitor... [a] contractor ... you don't need as many people to monitor yourself." Therefore, Maine Yankee's damages figure must credit to SWEC any decreases in its costs associated with its self-performance of the decommissioning. After evaluating Maine

Yankee's staffing levels of Maine Yankee's base organization when compared to Maine Yankee's staffing levels during self-performance after termination. Scientech found that SWEC was entitled to a credit in the amount of $7.3 million.

This credit represents savings in "non-scope" or "base" work, such as reduced costs of oversight personnel as a result of not having a general contractor. To calculate this amount, Scientech used Maine Yankee's own staffing reports and then calculated salaries and overhead associated with any positions that were eliminated as a result of Maine Yankee's implementation of the self-performance plan of the SWEC-scope work (this is referred to by the parties as "D&D," which stands dismantling and decontamination).

Debtors contend that Doubleday's calculation of base savings omitted $4.85 million in savings that should be credited to SWEC. The parties agree that for every net base spot that is left empty, there should be a credit against Maine Yankee's labor costs for that employee's wages. Staats base savings calculation differed from Doubleday's, leading to the credit, because he made different assumptions about the number of people moving from base to D&D. Staats' figure is based on 22 employees who moved from base to D&D, while Doubleday's report shows a smaller net reduction in the base post-termination.

Staats identified 22 employees from Doubleday's report and Maine Yankee's labor report who were in Maine Yankee's base pre-termination and moved to D&D afterwards. His opinion that the total salary of those employees should be subtracted from Maine Yankee's damages, assumes that for every person changing jobs after the termination of SWEC there was a corresponding decrease in the base and therefore a savings to Maine Yankee on

the base side. Maine Yankee's criticisms of Staats' analysis challenge this assumption. First, Maine Yankee argues that Staats failed to take into account that when a number of employees transferred from base to D&D, their positions were filled by others, resulting in no net savings for those positions. Maine Yankee's Michael Thomas testified that certain positions held by persons who moved from the base side to D&D were filled by other employees on the base side. He gave one example of this, noting that when Jim Connell moved from being manager of information technology on the base side to radiation protection manager on the D&D side, Gary Stewart filled Connell's vacated base side position. Maine Yankee also notes that Thomas testified that there had been a reduction by five people before termination, which cannot be attributable to termination and therefore should not factor into the base savings calculation. Second, Maine Yankee criticizes Staats' assumption that there were no new positions created on the base side as a result of the termination and his failure to consider those offsets. Thomas confirmed that Maine Yankee did experience increases in staffing on the base side due to SWEC's termination. He stated that one such example of a base area that required an increase in staffing in the accounting department, due to the substantial numbers of payments that Maine Yankee had to make to subcontractors, supplies, etc. due to Maine Yankee's self-performance of SWEC's scope of work.

After reviewing the calculations of Doubleday and Staats in light of these criticisms, the court finds Doubleday's methodology for calculating base savings more reliable than that of Staats. Doubleday compared the 2000 (pre-termination) base staffing projections with the 2001 (post-termination) base staffing projections. *See* Exhibit 290. Such analysis yields an over-all net decrease in the base, but also takes into account any vacated positions on the base side that were subsequently filled by other employees and any new positions that were created as a result of an employee moving to D&D. Thomas' testimony confirms that such changes did occur. Accordingly, the court declines to award SWEC any additional credit for base savings beyond that calculated by Doubleday.

SWEC also argues that it are entitled to an additional savings credit in the amount of $3.41 million for the labor and bonus costs of two of the five Entergy consultants hired by Maine Yankee to assist in the D&D work. Debtors contend that these Entergy costs should be removed from the Maine Yankee's labor estimate because the Entergy employees were base employees of Maine Yankee. In Maine Yankee's labor calculations, it placed three of the Entergy consultants on the base side, while placing two (Burke and another gentleman named Williams Henries) on the D&D side. Staats stated that all five should have been in the base and that the labor and bonus costs of Burke and Henry should be deducted from Doubleday's labor cost figure.

Henries is the director of engineering for D&D. Therefore, the court disagrees that he should be included as a base employee. In addition, the $2.15 million bonus attributable to Henries that Entergy was paid under its contract with Maine Yankee is dated June 1, 2001, which was well after the termination date. Turning to Burke, whose position at Maine Yankee is Vice President of Decommissioning, the court believes that it is also appropriate to include him in the D&D organization. Debtors contend that because Burke replaced Norton, who was then promoted, Burke should be counted as base. However, Burke indicated in his testimony that the role he fills on the project is equivalent

to the role of SWEC's project manager, before termination. That position was never part of Maine Yankee's base and was only required when SWEC was terminated. In sum, the court finds that but for Maine Yankee's termination and self-performance of the D&D project, Burke would not be employed at Maine Yankee. Therefore, it would inappropriate to include him on the base side.

Based on the foregoing, the court declines to increase Doubleday's base savings credit or decrease his labor costs line items.

### (v) *Disposal of Above–Grade Concrete*

The disposal of above-grade concrete, along with the RCRA closure costs, and costs to remove PCBs to less than 50 part per million are items within the scope of work that Maine Yankee had not yet contracted to perform. Scientech projected the costs for each, and listed each as a separate line item in its report.

Maine Yankee projects that it will be paying approximately $18.425 million to ship and dispose off-site the above-grade concrete. This total is approximately $3.325 million more than it would have cost to bury the concrete on site, as per SWEC's rubblization plan. Debtors contend that this difference is an out-of-scope cost. For the reasons set forth, infra, in section II.B.2.c.ii(i), the court concludes that these are in-scope costs that SWEC would have been responsible for had Maine Yankee not terminated the Agreement.

### (vi) *RCRA Closure Plan*

The RCRA Closure Plan refers to the planning, site investigation, and remedia-

tion that is required to comply with MDEP requirements for RCRA closure. SWEC was responsible for completing RCRA closure at the Maine Yankee site as part of the scope of the work under the Agreement. For costs relating to RCRA closure, Scientech projects that an additional $5.1 million will be required in addition to Maine Yankee's current RCRA waste contracts, which total $3.9 million.

As discussed below, the court concludes that the total RCRA costs of $9 million are reasonable. This is confirmed by the fact that Gerber's most recent estimates for the cost of implementing the RCRA closure plan as per SWEC's design documents is roughly $11 million. While Debtors suggest that Maine Yankee's RCRA cost projections are inflated because they are cleaning the facility to a more stringent standard (the "residential" standard) than the standard SWEC was obligated to meet under the Agreement (the "industrial" standard), this assertion is contradicted by Maine Yankee's QAPP plan [32] developed by Gerber. The QAPP plan indicates that Maine Yankee is cleaning the production facility areas where Gerber anticipates all the remediation to take place to an industrial standard.

### (vii) *PCBs Less Than 50 ppm*

As per the Decommissioning Agreement, SWEC was obligated to remove PCB contamination to a level of less than 50 parts per million and to perform scabbling of the below-grade concrete. Scientech estimates the cost of the PCB removal would be approximately $607,000. Doubleday opined that his projection was conservative, because since he had made his projections, Maine Yankee has re-

---

**32.** As Gerber explained, the QAPP sets forth the plan for the field investigation portion of the RCRA work.

ceived three higher cost bids for that work, which would cover a smaller scope that Doubleday had estimated. The lowest cost of those bids is $1.2 million.

Debtors do not challenge either the obligation for or the cost of this work. The court will therefore accept Scientech's cost projection.

### (viii) *Small Tools, Supplies, and Equipment*

Scientech's damage estimate also includes approximately $1 million for small tools and supplies necessary to the decommissioning. This cost is based on Scientech's review of Maine Yankee's self-performance estimate of what this would cost. As of the time Scientech reviewed the costs, on August 31, 2001, Maine Yankee had spent $800,000 on small tools and supplies.

Scientech also estimates that equipment necessary to the decommissioning will cost approximately $1.75 million, over $1.5 million of which had already been spent through August 31, 2001.

Doubleday indicated that his estimates did not take into account salvage value based on his assumption that the salvage value for equipment used for a number of years in a contaminated environment such as a nuclear power plant decommissioning site is negligible. Although Staats objected to Doubleday's failure to include a credit for salvage value, at trial, he agreed that he had no basis to contest Doubleday's opinion that "as a general rule of thumb of estimating salvage value in decommissioning a nuclear power plant, the standard practice is to assume that the added cost of disposing the irradiated equipment is going to at least offset and neutralize any salvage value that the equipment might have."

Based on the amounts already paid by Maine Yankee, Doubleday's projections for small tools, supplies, and equipment seem reasonably accurate. The court will include these cost items within the overall damages figure.

### (ix) *Reprocurement Costs*

Scientech also included the costs incurred by Maine Yankee to pursue the rebidding process. This cost item was calculated by analyzing how many Maine Yankee employees were involved in that process and how much time they had spent on it. Scientech's calculated this expenditure to be $482,433.

The Debtors do not dispute this cost and the court has no indication that the Scientech's calculation is anything but fair and reasonable. Accordingly, the court will accept is as a cost item to be included in Maine Yankee's damages.

### (x) *Additional Contingency Cost*

Scientech's damages analysis also included a line item for additional contingency costs for the SWEC scope of work in the amount of $9.3 million. Doubleday explained that contingencies—future costs within the contract scope that are anticipated, but presently unknown (i.e., "known unknowns")are expected real costs that should be included in any cost estimate for decommissioning work. He testified that in his experience, typical contingency cost line items can be as high as 20 to 25% of the work. In this case, Doubleday estimated a far lower contingency amount, because, since Maine Yankee is fairly far along in the project, many tasks have already been completed and many of the contracts for the remainder of the work are already in place.

Debtors position, as Staats explained, is that Maine Yankee's damages recovery should not include an additional contingen-

cy figure,[33] because such any recovery for contingency costs would be speculative. The court is not persuaded by this position and concludes that contingency is a reasonable and appropriate part of Maine Yankee's damages award. The court reaches this conclusion for several reasons. First, every witnesses who had experience as a project managers or cost-estimator agreed that every budget for a decommissioning project should include a contingency. Second, in SWEC's original bid for the Maine Yankee project and Shaw's bid to take over the SWEC scope of work after termination, both included contingencies as a cost in their fixed price bids. Further, Staats acknowledged during his testimony that the Dept. of Energy handbook indicates a range of contingencies that one should apply to estimates of decommissioning costs. Third, as of the termination date, SWEC carried over $10 million in contingency on its own earned value statement.

Including contingency as a real cost of decommissioning is therefore an acknowledged practice within the industry. Although, by its nature, it cannot be precisely calculated, it is a real cost in that practice in the industry has demonstrated that a certain percentage of contingency is required to account for unexpected costs. In the words of Kane, it is a "known unknown." As of the date of termination, Maine Yankee assumed the attendant risks of the SWEC scope of work, and should therefore also be able to recover a contingency amount that corresponds to those risks.

Accordingly, the court is comfortable including a reasonable contingency amount in Maine Yankee's damage award. Courts have recognized that where damages

awards are based on construction (or in this case, deconstruction) estimates, it is proper to include in the damages award reasonable contingency amounts that are part of the construction estimate. *See, e.g., Brooklyn Waterfront Terminal Corp. v. Int'l Terminal,* 211 F.Supp. 702, 708 (S.D.N.Y.1962) (allowing 10% contingency item for damages to pier).

The court believes that a contingency damages figure is appropriate and finds that the $9.3 million contingency, which represents approximately 5.7 percent of the cost of remaining work (estimated at $163 million), to be reasonable. Doubleday testified that this contingency percentage was relatively low. Given that the decommissioning is now over halfway complete and that Maine Yankee has a number of the subcontracts in place and a firmer grasp on its expected costs than it would have had the project just begun, the unallocated costs associated with the contingency figure should be lower than a contingency cost that is budgeted at the outset of a project. While SWEC argues that this justifies an even lower percentage contingency than 5.7 percent, the court finds that 5.7 percent is a reasonable figure. It compares favorably with the contingency of $10 million (approximately 5%) included SWEC's own post-termination bid to complete the work.

Therefore, the court will include a contingency of 5.7% of the total cost to complete.

#### (xi) *Electricity Costs for Decommissioning Scope*

Scientech calculated that it will cost Maine Yankee $1.18 million for electricity to be used in completing the Work. This

---

**33.** Staats also opined that Maine Yankee's base pre-termination contingency of $14 million should be subtracted off of its damages

for the same reason. Debtors appear not to pursue this contention in its post-trial briefing.

estimate is based on actual usage data, used to develop annual estimates through the year 2005.

This expenditure is unchallenged, and the court will incorporate it into Maine Yankee's damages award.

### (xii) *Costs of Major Purchase Orders*

The final line item cost included in Scientech's damages estimate was $4.18 million for purchase order commitments relating to the scope of work under the Agreement that are not reflected in any subcontract or other line-item in the damages estimate.

The Debtors do not appear to dispute this cost. Accordingly, the court will accept it as a cost item to be included in Maine Yankee's damages.

### (xiii) *Total Line Item Costs*

Based solely upon its review of Debtors challenges to the individual line items in Doubleday's cost to complete projections, without yet considering Debtors' broader challenges to Maine Yankee's damages case, the court concludes that Doubleday's $275,151,017 million figure for the cost to complete the decommissioning work—and his corresponding $81 million damages figure—is a fair and reasonable estimate. In addition to holding up to scrutiny on a line by line cost item basis, Doubleday's cost to complete figure compares favorably with Maine Yankee's self-performance estimate of $73 million (excluding contingency) and is lower than the marketplace value of the cost to complete the work, as indicated by the other qualified competitive bids received by Maine Yankee.

### ii. *Analysis of Debtors' Broader Challenges to Maine Yankee's Damages Case*

In addition to challenging Doubleday's line item cost projections, Debtors levy additional challenges, which the court will consider below, as to why Maine Yankee's damages amount must be adjusted downward. These include adjustments for out-of-scope costs, delay costs, present value, Maine Yankee's purported failure to collect certain amounts from Federal, and an offset for amounts Maine Yankee owed to SWEC.

### (i) *Out of Scope Costs*

 Debtors assert that Maine Yankee improperly seeks to include in its damages certain costs for work that Maine Yankee is presently performing but which SWEC was not obligated to perform under the Decommissioning Agreement. Principally, Debtors focus on two regulation-related events that Debtors contend led to out-of-scope changes that resulted in increased costs to complete the work: (i) Maine's decision to regulate the rubblized concrete as "special waste;" and, (ii) Maine Yankee's negotiation and acceptance of regulations that adopt a stricter (10/4 millirem) site release standard than the standard SWEC was obligated to meet in the Decommissioning Agreement. Debtors contend that the cost increases associated with complying to these regulatory changes should be borne by Maine Yankee and not by SWEC. The court will discuss the "special waste" issue first and then turn to the 10/4 issue.

In opposition to SWEC's position that costs associated with MDEP's "special waste" designation are out of scope, Maine Yankee contends that under the Decommissioning Agreement SWEC bore the risk that its rubblization plan would not comply with applicable regulations. To support that proposition, Maine Yankee points to Article 18 of the Agreement and section 7.2.11 of the Amended RFP.

Section 18 of the Agreement, states that "the Contractor shall, at its cost, comply with applicable written Federal, state and local laws, permits, license and regulations." Similarly, section 7.2.11 of the Amended RFP provides that "[t]he Contractor shall be responsible for compliance with the conditions and provisions of such licenses, permits, or approvals ... required in order to accomplish the Work as provided in the Contract Documents." It later adds that the "[c]ontractor shall have that risk of decisions, rulings, or actions by regulatory agencies or governmental bodies that has an impact on the Work as provided by the Contract Documents." Therefore, under the Agreement, any costs arising from adverse regulatory decisions lay with SWEC.

In light of these provisions, SWEC's answers to questions about its proposal do not establish that Maine Yankee should instead bear the risk for MDEP's regulatory decisions concerning special waste. In response to Question 196, which asks if a scope change would be necessary if rubblization were not accepted by regulators, SWEC's Nauman responded that their proposed rubblization approach "meets all current regulatory requirements. If more restrictive regulations are imposed subsequent to this proposal requiring a more costly approach, a scope change would be required."

While the parties disputed with MDEP whether its actions were appropriate, it is undisputed that as a factual matter MDEP's "special waste" determination was not made pursuant to any new laws or regulations. While MDEP had not done so before, and neither party anticipated or agreed with MDEP's determination, it is clear that MDEP applied existing regulations to classify the rubblized concrete as special waste. *See* Me.Rev.Stat. Ann. § 1303–C(34) (West 2001).[34] Thus the question before the court is which party bore the burden of this unexpected risk under the Agreement.

Section 7.1.2 of the Amended RFP states that SWEC is entitled to a change in work scope in six circumstances. Of the two circumstances that SWEC argues are relevant here—change in laws or force majeure—neither entitles SWEC to a change in scope. First, MDEP's special waste determination was simply not a new law; it was a novel interpretation of existing laws. Nor can the Agreement's force majeure clause relieve SWEC of this liability, because SWEC expressly bore the risk of adverse regulatory decisions in other sections of the Amended RFP and contract documents. The risk of regulatory approval under existing laws was placed squarely on SWEC. Therefore the court concludes that the costs associated with transporting the above grade concrete off-site, which are included in Doubleday's damages calculations, are properly recoverable to Maine Yankee.

 Turning to the 10/4 issue, however, it is clear that this move to a stricter waste clean-up standard was a change in laws. Meisner and Kane both testified that Maine Yankee negotiated with regulatory bodies and stakeholder groups and agreed to perform the decommissioning to a stricter 10/4 standard. That standard was subsequently adopted into law. While

---

34. SWEC also argues that MDEP's special waste determination is preempted by federal nuclear regulations and illegal, and that therefore SWEC was not obligated to perform work associated with that determination under the Decommissioning Agreement. The court cannot accept this argument in light of the plain language of 42 U.S.C. § 2021(k), which allows states to regulate "activities for purposes other than protection against radiation hazards."

acknowledging that the 10/4 legislation was a change in law, Maine Yankee nonetheless contends that its damages estimate does not include costs associated with 10/4. Maine Yankee argues that because SWEC agreed to perform the work to the more restrictive standard of 20,000 DCGL, there are no new costs with moving from the 25 mR standard to the 10/4 mR standard.

The contract documents unambiguously indicate that the site release standard that SWEC committed to achieve under the Decommissioning Agreement was 25 mR plus ALARA, and that SWEC's proposal of 20,000 DCGL was simply a guideline that it expected to use to meet the 25 mR standard. SWEC was obligated to perform the cleanup to meet a DCGL that satisfied the 25 mR standard, not to a specific DCGL. Therefore, the change from a 25 mR clean-up standard to a 10/4 standard was a change in scope due to a new law.

The Debtors marshal convincing evidence to oppose Maine Yankee's contention that performing the cleanup to a 10/4 millirem standard would not cost any more money than cleaning to a 25 millirem standard. First, documentary evidence show while Maine Yankee was in negotiations with the stakeholders and regulatory authorities, it solicited estimates from SWEC for the additional costs arising from 10/4. Maine Yankee's correspondence demonstrates that, at that time, Maine Yankee realized that it would incur costs to move to the stricter standard. At that time, the issue between SWEC and Maine Yankee was not whether Maine Yankee would pay for the change in scope, but how much Maine Yankee would pay. While Maine Yankee later took the position, in a March 13, 2000 letter, that no additional cost would be required to achieve the 10/4 standard, if certain "administrative controls" were implemented, this position is not supported by common sense or Debtors' evidence of costs. Indeed, Nauman testified that the only way that Maine Yankee's position could be reconciled with the fact that additional costs were necessary, would be if the term "administrative controls" were itself understood to indicate additional work and costs.

The court finds that Debtors' evidence on the cost increases associated with changing from a 25 mR standard to the 10/4 standard is credible and reasonable. While Maine Yankee appears to have shifted positions on whether there are costs to implement 10/4, Debtors have remained consistent in their position that there are real costs in moving to a stricter standard. These costs include costs associated with additional soil remediation, more intensive, time consuming, and costly surveying, additional concrete remediation, additional efforts to achieve the 4 mR groundwater standard, and additional waste costs.

Maine Yankee's damages analysis doesn't specifically set forth which of its costs are associated with moving to a stricter clean-up standard. Nonetheless, Debtors evidence proves that such costs exist. These increased costs should not be included in Maine Yankee's damages, because they exceed the scope of work the SWEC was obligated to perform under the Decommissioning Agreement. The only evidence offered of the costs associated with moving to the 10/4 standard are the estimates created by SWEC at Maine Yankee's request. These estimates range from $11 million to $26 million, but, as Debtors point out, a review of those estimates indicates that the $11 million estimate most closely relates to Maine Yankee's performance of the work to the 10/4 standard. Accordingly, the court will adjust Maine Yankee's damages downward by $11 million to account for out-of-scope costs associated with moving to a 10/4 standard,

which are not properly recoverable from SWEC.

In sum, the court concludes that the costs associated with transporting aboveground concrete, due to MDEP's special waste determination, should be borne by SWEC. Those costs are properly included in Maine Yankee's damages estimate. However, increased costs due to moving from the 25 mR standard of the Decommissioning Agreement to the stricter 10/4 mR cleanup standard, should not be borne by SWEC. Although Maine Yankee's damages estimate does not specifically detail the costs associated with performing the decommissioning work to this standard, the evidence demonstrates that there are increased costs. The best and only estimate of these costs is found in Debtors' $11 million estimate that was produced, upon request, to Maine Yankee. Therefore, the court will account for this cost by reducing Maine Yankee's damages amount by $11 million.

### (ii) *Failure to Allocate Delay Costs*

■ Debtors next that Maine Yankee's failed to do a proper "delay analysis" of the cause of the 6 month delay from the completion date reflected in the Decommissioning Agreement to Maine Yankee's current projected completion date of October 2004. Debtors contend that Maine Yankee cannot recover damages associated with delays unless they prove that those delays are chargeable to SWEC and would not have been avoided by SWEC. In their post-trial brief, Debtors argue that because Maine Yankee failed to prove that the delay was chargeable to SWEC, Maine Yankee's damages must be reduced by at least $2.17 million, which is the amount that Staats calculated was the cost for supervisory labor associated with the 6 month delay.

The court does not believe that any adjustment is required for delay costs. The court has found that SWEC breached the Decommissioning Agreement and that Maine Yankee's mitigated its damages by weighing other contractors' bids against its own self-performance bid. Conceptually, Maine Yankee is therefore owed damages based on the cost of completion for the SWEC scope of work. The fact that Maine Yankee now projects that it will not complete that scope of work until six months after the date of completion in the Decommissioning Agreement does not mean that any "delay" costs adjustments are properly compensable to SWEC. So long as the damages that Maine Yankee are recovering are based on Maine Yankee's cost to complete the SWEC scope of work, it is proper for Maine Yankee to recover that entire amount.

Even if the court were to conclude that such delay costs were owed, it would still not have awarded any such cost in this instance. Staats' analysis simply subtracts the labor costs incurred by Maine Yankee for the six month delay, thus attributing the cause of the delay to Maine Yankee. This presumes that SWEC would have completed the project on time. The record indicates, however, that based on SWEC's own projections at the time of termination, it was projecting to finish the work 3 months *later* than Maine Yankee is currently projecting to finish. Although Maine Yankee's subsequently produced "aggressive" schedule targets an on time completion date, in light of SWEC's inability to stay on schedule under the Decommissioning Agreement, the court does not find that schedule to be credible evidence that indicates that SWEC would complete the work any earlier than Maine Yankee is projecting now. But for termination, under the fixed price Decommissioning Agreement, these delay costs are costs

that SWEC—not Maine Yankee—would have had to bear. Therefore, the court disagrees that a delay claim adjustment is required or warranted.

### (iii) *Failure to Perform Present Value Calculation*

■ Debtors, through their expert Staats, also contend that Maine Yankee's damages estimate must be reduced by use of a present value adjustment. Using a May 2000 date, Staats applied a discount rate of 6.69% to the Maine Yankee's damages and calculated a reduction in Maine Yankee's damages of $12 million. In addition, in its post-trial briefing, Debtors contend that the $65 million damages cap— and not simply the gross damages figure awarded to Maine Yankee—must be adjusted for present value.

Scientech's damages report confirms that it did not perform a present value computation on the overall damages figure and that, therefore, the damages estimate is based on current day dollars. At trial, Doubleday explained that he chose not to perform such an analysis because "due to the current low interest rates and the fact that payments of damages don't appear imminent, I didn't feel that the time effect of money was significant."

In its post-trial briefing, Maine Yankee first argues that "any arguable present value is more than offset by the conservative omission from the $81 million estimate of [certain] costs [in Doubleday's cost to complete calculations]." Next, assuming that some sort of present value is appropriate, Maine Yankee challenges Staats use of the 6.69% discount rate, and asserts that the correct rate to use would be Maine Yankee's then cost of capital of 3.6% or its present cost of capital of 2%. Last, Maine Yankee takes issue with Debtors' position that the net present value deduction should be applied to the $65 million damages cap figure rather than on Maine Yankee's gross damages figure. Maine Yankee argues that the proper methodology is to first determine the net value of Maine Yankee's claim by calculating the net present value of Maine Yankee's asserted damages based on the contractual formula. Then, the damages cap should be applied, to reduce that adjusted claim to $65 million, if it exceeds $65 million. Therefore, Maine Yankee contends, application of the net present value analysis to the $65 million cap so as to reduce the cap would be illogical and wrong.

Due to SWEC's breach, Maine Yankee will be recovering compensatory damages from SWEC to pay for the D&D work instead of paying those amounts to SWEC. Because Maine Yankee will be recovering damages before they were to be due under the Agreement, its recovery amount should be discounted to account for the fact that it is being compensated early with the expectation that it will use its recovery to make payments from that amount to perform the D&D work over a period of time extending to the completion of the project. Therefore, the court agrees that a present value adjustment is required.

The parties dispute the appropriate discount rate to be used. The proper rate to choose as the discount rate is the projected interest rate, or rate of return, that Maine Yankee expects to receive on its investment of the funds. SWEC suggests that the proper discount rate is the cost of borrowing capital, for which it uses the 5 year T–Bill rate of 6.69%. Based on the court's understanding of the purpose of using a present value analysis to adjust the damages award, a better choice for the discount rate is Maine Yankee's present rate of return for its invested funds, which is 3.6%.

The parties also seem to dispute whether to apply the present value analysis to Maine Yankee's gross damages amount or to its net damages amount (i.e. after application of the $65 million damages cap and adjustments for recoveries from the Federal settlement). Debtors argue that the $65 million damages cap itself must be adjusted for present value. The court finds that such an approach is illogical and unsupported by Staats testimony. The damages cap is an arbitrary contractual limitation of damages that is applied to reduce Maine Yankee's total claim against SWEC. Present value should be applied not to this figure, but to Maine Yankee's actual damages.

The only sensible approach to adjusting for present value is to perform the net present value calculation on Maine Yankee's gross damages figure so as to calculate the net present value of Maine Yankee's damages. Subsequently, the court will calculate Maine Yankee's maximum allowable recovery under the Agreement, by applying the damages cap and deducting any settlement monies from the recovery amount.

### (iv) *Failure to Credit SWEC's Proven Claims*

SWEC asserts that Maine Yankee's damages figure fails to credit SWEC's proven claims against Maine Yankee. On July 26, 2001, the court found Maine Yankee liable to SWEC in the amount of $1,227,524.64 for work performed and invoiced before termination, but suspended an award of damages due to the potential mutuality of debts which may permit a set-off.[35] *See In re Stone & Webster, Inc.*, 270 B.R. 1, 4 (D.Del.2000) ("to the extent that Maine Yankee owes SWEC for work done

in April 2000, Maine Yankee may set off that amount against potential claims that it may have against SWEC for breach of the decommissioning agreement"); *In re Stone & Webster, Inc.*, No. 00-2142, 2001 WL 849738, at *13–14 (Bankr.D.Del.2001). SWEC now seeks to be credited for that amount owed, plus interest. Applying an interest rate of 1.5% per month since May 2000 to the $1.2 million owed, SWEC contends that it is owed a set-off or recovery in the amount of $1,678,097. Doubleday conceded during his testimony that he did not consider SWEC's entitlement to these funds in his damages analysis.

In response, Maine Yankee asserts that SWEC is not entitled to the offset that it seeks for two reasons. First, Maine Yankee argues that since it properly terminated the Decommissioning Agreement under Article 11.2, as well as under Article 11.1, the language of that section entitled Maine Yankee to terminate the Agreement "without any further liability to Contractor." Therefore, it does not have to pay the amount claimed by SWEC. In addition, Maine Yankee argues that it has already given SWEC credit for the full $1.2 million claimed because under damages formula of Article 11.4, the amount of SWEC's off set claim, not having been paid, was not subtracted from the "remaining Agreement funds." Maine Yankee explains that if it now had to pay the amount, Maine Yankee's damages would simply increase by the same amount, offsetting in full any need to pay that amount.

Article 11.4, in relevant part, provides that "If Contractor fails to substantially perform under the Contract Documents or if Contractor materially breaches any of the terms of the Contract Documents . . .

---

**35.** The court did so over SWEC's objection. Debtors position was that under 11 U.S.C. § 502(d), payment of a pre-petition invoice cannot be offset against a post-petition claim. Debtor's reiterated this objection is their post-trial briefing.

Maine Yankee shall have the right, without any further liability to Contractor ... [to terminate the agreement, obtain performance from another contractor, and/or sue the Contractor for breach]." The court does not construe the "without any further liability" language to mean that Maine Yankee does not need to pay amounts then due and owing under the Agreement. Rather, that language simply means that if Maine Yankee properly terminated the Agreement under Article 11.2, Maine Yankee is not liable to SWEC for any damages arising from that termination (i.e., a breach of contract action).

▆▆▆ Maine Yankee is correct, however, that the damages formula in the contract intrinsically accounts for the amount owed to SWEC. Damages are calculated under the Agreement as follows. First, the unpaid agreement funds are calculated by determining the difference between the payments Maine Yankee had made to SWEC under the Decommissioning Agreement and the total contract price. Maine Yankee's total damages award is the difference between Maine Yankee's cost to complete the remaining scope of work and the unpaid agreement funds that it would have owed to SWEC under the Agreement. If Maine Yankee had paid SWEC the $1.2 million it owed in May 2000, that would have decreased the "unpaid agreement funds" by that amount. Since the unpaid agreement funds are subtracted from the cost to complete in order to determine the damages, Maine Yankee's damages award would have risen by that same amount. As Maine Yankee did not pay the $1.2 million to SWEC, its present damages estimate is already reduced by that amount from the damages it would have requested had it paid the $1.2 million. Therefore, no set off for the $1.2 million is necessary.

SWEC should, however, be compensated for the interest on that amount. The court will reduce Maine Yankee's net damages award by $450,000.

(v) *Failure to Collect from Federal*

▆▆▆ Maine Yankee's damages analysis subtracts out the full amounts paid by Federal under the payment and performance bonds ($44 million) from the damages sought against SWEC. In its post-trial brief, Debtors contend that they should receive a further credit in the amount of $6.525 million, because Maine Yankee could have recovered that additional amount under the payment bond had Maine Yankee not settled with Federal. Maine Yankee contends that its decision to settle was reasonable, because, in order to recover the full amount of its claims, it would have had to reject the full 100% settlement on the performance bond, prove total damages in excess of $50 million, and prove the merits of each and every subcontractor's claim on the payment bond. Moreover, Maine Yankee notes that the settlement agreement itself indicates that the presiding U.S. District Court Judge who mediated the Federal settlement expressly found the settlement to be reasonable. Because the settlement was reasonable, Maine Yankee contends that there is no basis to reduce its damages award by the amount that it "could have" recovered had it not settled.

In his November 21, 2001 decision in Maine Yankee's action against Federal in the District of Maine to recover on the payment and performance bonds procured by SWEC, Chief Judge Hornby concluded that "Maine Yankee can proceed on its equitable subrogation claim against Federal Insurance for unjust enrichment based upon payments made to subcontractors and suppliers for work performed and ma-

terials supplied before May 4, 2000." *Fed. Ins. Co. v. Maine Yankee Atomic Power Co.*, 183 F.Supp.2d 76, 86 (D.Me.2000). He could not, however, at that time determine the amount of recovery for Maine Yankee from Federal. Although the parties stipulated that approximately $12 million of the amounts Maine Yankee paid to subcontractors and suppliers was for work performed and materials supplied prior to May 4, 2000, fact issues remained as to whether those payments were to proper claimants under the payment bond or whether certain amounts should be set off against Maine Yankee's recovery. *Id.*

Maine Yankee's maximum recovery from Federal under the payment bond was $11.4 million. In order to recover that full amount from Federal, Maine Yankee would have had to proceed with the trial. In doing so, Maine Yankee would have assumed the risk of being unable to prove the full amount of its claims. There is no basis to conclude that Maine Yankee's decision to settle the claims with Federal was unreasonable or that the settlement amount was unreasonably low. Therefore, the court will not reduce Maine Yankee's damages for amounts that it could have but did not recover from Federal, due to its decision to settle.

3. *Is This Trial an Estimation Proceeding or Will the Court Allow Maine Yankee's Claims in the Amount of its Proven Damages?*

■ Based on the court's conclusions regarding the parties' damages analyses in the case, the court concludes that Maine Yankee has proven damages in the amount of $20.8 million. This figure is calculated as follows. The court took Maine Yankee's $81 million damages figure and adjusted it downward by $11.45 million. These adjustments are for the 10/4 costs incurred by Maine Yankee and for the

interest Maine Yankee owed to SWEC on its set-off claim. Next, the $69.55 million amount is discounted back at a rate of 3.6 percent. This yields a damages figure of approximately $64.8 million. As this amount is below the $65 million damages cap, the court needs only to reduce the amount by the $44 million recovered from Federal on SWEC's bond to calculate the amount owed by the Debtors on Maine Yankee's proof of claim, $20.8 million.

The parties dispute whether the trial proceeding before the court in this matter should be treated as an estimation proceeding of a contingent claim, *see* 11 U.S.C. § 502(c), or as a full adjudication of Maine Yankee's proof of claim and Debtors' objections thereto. Section 502(c) provides that:

■ There shall be estimated for purpose of allowance under this section—

(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or

(2) any right to payment arising from a right to an equitable remedy for breach of performance.

Thus, "section 502(c) provides a mechanism for estimating the amount of a contingent or unliquidated claim for the purpose of its allowance where the actual liquidation of the claim as determined by the court would unduly delay the administration of the case." 4 Collier's on Bankruptcy ¶ 502.04(1) (15th ed.2001). A court must only perform an estimation proceeding where the fixing of the claim "would unduly delay" the administration of the bankruptcy case. *See O'Neill v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 981 F.2d 1450, 1461 (5th Cir.1993) ("In order for the estimation process of § 502(c) to apply, … fixing the claim must entail undue delay in the administration of justice."); *see*

*also In re Dow Corning, Corp.*, 211 B.R. 545, 562–63 (Bankr.E.D.Mich.1997) ("bankruptcy law's general rule is to liquidate, not to estimate").[36]

■ The purpose of an estimation proceeding is to avoid delays that may arise from waiting to fix the value of contingent claims. An estimation proceeding expedites the bankruptcy process so that key steps in a reorganization that depend on the fixing of value may proceed. *See In re Dow Corning, Corp.*, 211 B.R. at 562. In essence, an estimation proceeding is a procedural device that is to be used when adjudication and liquidation of a claim would take an unreasonably long time to allow courts to quickly and flexibly estimate the amount of an as yet to be liquidated claim.

If the court were to label its instant determination an estimation proceeding, it would leave for some other judge the task of rendering a final adjudication of the claim and allowing payment thereof. Having already conducted a full trial on liability and damages issues comprised of seven days of testimony and hundreds of exhibits, the court is prepared to render a final adjudication of Maine Yankee's claim at this point.

Debtors argue that there are three reasons for estimation. First, the Decommissioning Agreement itself establishes a process that Maine Yankee must follow to obtain damages. Article 11.4 states that if there are monies owing to Maine Yankee for breach, "[SWEC] shall pay to [the amount owed] to Maine Yankee within thirty (30) days following receipt of an undisputed invoice from Maine Yankee." Based on this provision Debtor's argue that any payment of a claim to Maine Yankee would be premature, because Maine Yankee has not yet completed the work and provided SWEC with the receipt for that work. Second, Maine Yankee's actual costs are presently unknown, because it will take it approximately two and half more years to complete the decommissioning work. Third, Maine Yankee may not obtain a double recovery on its damages by obtaining payment on its allowed claims while pressing its ISFSI costs against the DOE in its current lawsuit against that agency. *See Maine Yankee Power Co. v. United States*, 42 Fed.Cl. 582 (1998), aff'd, 225 F.3d 1336 (Fed.Cir.2000). For these reasons, Debtors contend that the court's order should not allow Maine Yankee's proof of claim, but should instead estimate Maine Yankee's future recovery. Then, at some point in the future, Maine Yankee should be paid on its claims, but only when the decommissioning is complete and Maine Yankee's other disputes relating to the decommissioning are over.

Only Debtor's first argument gives the court pause.[37] Fairly read, the provision

---

**36.** As to the manner in which courts are to estimate claims, the Third Circuit has stated that bankruptcy judges are to use "whatever method is best suited to the particular contingencies at issue.... [W]here there is sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge should determine the value." *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 135 (3d Cir.1982).

**37.** That Maine Yankee's damages have an element of uncertainty is of no moment to the court. Damages awards are often based on projected costs. So long as the assumptions underlying those projections are adequately tested, this is not reason enough to delay granting a damages award. As for Maine Yankee's potential recoveries from other sources, the court is confident that counsel will not permit any illegal "double recoveries." Maine Yankee is entitled to elect to seek amounts owing from other parties, such as the DOE, for its fuel storage costs, so long as it does not actually recover against both in a manner that is duplicative. Simply, once Maine Yankee recovers from one party, it must reduce its damages request from the

of Article 11.4 quoted above requires that the damages arising from any breach of the Decommissioning Agreement be fully liquidated before payment. In other words, Maine Yankee's damages claim is contingent, because, under the Agreement, it cannot recover for costs due to a breach before it incurs those costs. Debtors correctly point out that in Maine Yankee's objection to Debtors' Motion for Partial Summary Judgment on Damage Claims on the issue of ripeness (D.I.1968), Maine Yankee itself relied upon the fact that a court could conduct an estimation proceeding under Code section 502 to support its contention that damages should be calculated now despite the terms of Article 11.4 of the Decommissioning Agreement.

In Debtors' motion for partial summary judgment, Debtors argued that pursuant to Article 11.4 Maine Yankee's claims should be dismissed as unripe. In opposition, Maine Yankee reasoned that a contractual agreement to postpone final recovery until full maturation or liquidation does not provide a defense under the Bankruptcy Code. Maine Yankee argued that under section 502(b)(1), defenses based on pre-maturity (in the words of the statute, "contingent or unmatured") are not preserved as defenses to a claim under the Code. Rather, section 502(c), provides that such claims may be resolved in estimation proceedings. The court agreed with Maine Yankee, rejected the Debtors' ripeness defense, and concluded that "the quantity of Maine Yankee's damages, if

proven, remains an issue for the court's consideration and possible estimation pursuant to 11 U.S.C. § 502(c)." *In re Stone & Webster,* 270 B.R. at 13.

Because of the contractual provision that requires the court to treat Maine Yankee's claim as a claim that is not to be paid until the decommissioning work is complete, the court will treat the trial as an estimation proceeding of Maine Yankee's claim. It will apply its conclusions as to the appropriate measure of damages to fix the dollar amount of Maine Yankee's claim, but such damages may be subject to adjustment to the extent they differ from the actual costs that are submitted to Debtors, once the decommissioning work is complete.[38] Beyond that, however, the opportunity for a final adjudication of damages should not be interpreted as an opportunity to retry issues—such as liability issues concerning Maine Yankee's right to termination, Maine Yankee's purported failure to mitigate damages, or disputes about certain work being in-scope or out-of-scope—that have been tried to and passed upon by this court in this opinion.

Last, the court notes that this issue—whether the language of the Decommissioning Agreement mandates that damages not be awarded to Maine Yankee until the costs to complete are incurred—was not addressed at any great length in the post-trial briefing. To the extent that Maine Yankee believes that there is reason for the court to revisit this interpretation,

other party. Just as it has with the Federal settlement, should the Debtors' liability exposure be reduced by way of settlement or recovery from another party, Maine Yankee must reduce the amount of money it seeks. Similarly, should a third party's liability exposure be reduced by way of recovery against the Debtors, Maine Yankee must reduce the amount it seeks from that party. Thus, the threat of double recovery does not bear on

whether the court renders a final adjudication or an estimation at this point.

**38.** In addition to adjusting the projected costs to actual costs, this may also require an adjustment for any unspent contingency amounts and obviate the need to perform a present value adjustment on the damages amount. The court includes these figures in its estimation in an effort to best estimate the current value of Maine Yankee's claim.

which mandates that its claim remain unliquidated until it completes the work and submits corresponding receipts to the Debtors,[39] the court invites it to seek reconsideration of this point and to provide further briefing on this matter.

### 4. *To What Extent are SWINC and SWE&C Liable?*

 There is also a dispute between the parties as to whether SWINC and SWE&C's respective liability is limited to 50 percent of SWEC's damages or whether Maine Yankee may recover the full amount of its damages jointly and severally from either of the Debtors.

The terms of their identical guaranties state that SWINC and SWE & C agreed to "guarantee [SWEC's] performance of the Agreement up to an amount equivalent to fifty percent (50%) of the Agreement's unpaid balance of the contract price (as such term is defined in the Agreement) at the time of [SWEC's] failure to perform the Agreement." This language unambiguously states that each guaranty was "up to an amount equivalent to fifty percent of the Agreement's unpaid balance of the contract price." The evidence indicates that this amount is in excess of $194 million, fifty percent of which is $97 million. Maine Yankee's claim seeks $21 million in damages from each of the Stone & Webster companies. As this amount is less than the $97 million limit of each guaranty, Maine Yankee may seek full payment on its claim, once approved, from either SWINC or SWE&C, as guarantors. Therefore, the court's damages award will be joint and several against SWEC, SWINC, and SWE&C.

### III. *CONCLUSION*

For the reasons stated above, the court concludes that Maine Yankee was within its right to terminate the Decommissioning Agreement for cause under provisions 11.1 and 11.2. Maine Yankee has proved damages, recoverable from SWEC, SWINC, or SWE&C in the amount of $20.8 million. The court, therefore, will estimate Maine Yankee's allowable claim at that amount.

The court will enter an order in accordance with this opinion.

**39.** The contract language requires that these receipts to be "undisputed." However, to the extent that the court has resolved certain disputes regarding costs in this opinion, those determinations should be binding on the parties.